# IN THE SUPREME COURT OF TEXAS

═══════════

No. 16-0773

═══════════

WALLACE L. HALL, JR., IN HIS OFFICIAL CAPACITY AS A REGENT FOR THE
UNIVERSITY OF TEXAS SYSTEM, PETITIONER,

v.

WILLIAM H. MCRAVEN, IN HIS OFFICIAL CAPACITY AS CHANCELLOR FOR THE
UNIVERSITY OF TEXAS SYSTEM, RESPONDENT

═══════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

═══════════════════════════════════════════════════════

**Argued January 11, 2017**

JUSTICE DEVINE delivered the opinion of the Court.

JUSTICE WILLETT filed a concurring opinion.

JUSTICE GUZMAN filed a concurring opinion.

JUSTICE LEHRMANN filed a concurring opinion.

JUSTICE BROWN filed a concurring opinion, in which JUSTICE GREEN joined.

Wallace Hall, a regent for The University of Texas System, sued the System's Chancellor,
William McRaven, for McRaven's refusal to grant Hall complete access to records containing
student-admissions information. At the heart of the case are issues central to governance in higher
education. Does a university regent have an inherent right to access information? If so, how

unfettered is that right? Can an institution invoke federal privacy law, namely the Family Educational Rights and Privacy Act (FERPA), to redact information and limit a regent's quest for complete access? These are important questions, but before a court can reach them, a plaintiff must overcome the state's sovereign immunity. Absent a statutory waiver of immunity by the Legislature, Hall can proceed only if McRaven's actions in redacting the records were *ultra vires*—without state authority. The courts below held that McRaven's conduct was not *ultra vires* and that sovereign immunity required dismissal. We agree and affirm.

I

*Ultra vires* claims depend on the scope of a state official's authority. The natural starting point in this case, therefore, is the governing structure of the UT System. The authority and duties of the leaders of UT come from various sources, each with an increasing level of specificity. First, the Texas Constitution instructs the Legislature to "organize and provide for the maintenance, support and direction of a University of the first class, to be located by a vote of the people of this State, and styled, 'The University of Texas.'" TEX. CONST. art. VII, § 10. Acting on that directive, the Legislature established the UT System and vested governing power in a nine-member Board of Regents. TEX. EDUC. CODE § 65.11. Each regent is appointed by the Governor with the advice and consent of the Senate. *Id.* The Legislature gave expansive authority to the Board to "govern, operate, support, and maintain" the System. *Id.* § 65.31(a). The Board must also "provide the policy direction" for each respective institution within the UT System. *Id.* § 51.352(b) (assigning responsibilities to all governing boards of institutions of higher education in Texas). The Board also

2

bears more specific statutory responsibilities, such as to "set campus admission standards." *Id*. § 51.352(d)(4).

The Board is not expected to run the entire UT System by itself. Instead, the Legislature authorized the Board to promulgate rules and to use those rules to "delegate a power or duty of the board to a committee, officer, employee, or other agent of the board." *Id.* § 65.31(c), (g). These rules, the Regents' Rules, have the same force as an "enactment of legislature." *Univ. of Hous. v. Barth*, 403 S.W.3d 851, 855 (Tex. 2013).

The Legislature also directs the Board to appoint the Chancellor "or other chief executive officer of the system." TEX. EDUC. CODE. § 51.352(d)(2). But the Education Code says little else about the Chancellor's duties, save the following:

> Subject to the power and authority of the board, the chief executive officer is responsible for the general management of the university system within the policies of the board and for making recommendations to the board concerning the organization of the university system and the appointment of the chief administrative officer for each component institution within the system.

*Id.* § 65.16(c)*.* As a result, the specific responsibilities of Chancellor McRaven—which are of utmost importance to this lawsuit—come from the rules and resolutions of the Board, which we consider in the context of this dispute between the System's Chancellor and one of its regents.

## II

The underlying dispute began in 2013, when Regent Hall raised concerns about potential improprieties in the admissions process of UT Austin, one of the 15 institutions that comprise the UT System. In response, then-Chancellor Francisco Cigarroa ordered an internal inquiry into the admissions practices. That inquiry revealed a common practice of legislators, alumni, regents, and

3

other influential individuals recommending students for admission to UT Austin outside of the established procedures for submitting such recommendations. These findings spurred Chancellor Cigarroa to commission another investigation into the UT Austin admissions process: an independent, external investigation performed by Kroll Associates, Inc.

In the midst of Kroll's investigation, McRaven took over as Chancellor of the UT System. Kroll then released its findings in a 101-page report. The "Kroll Report" outlined a practice of UT Austin's President—based on recommendations from influential persons—to exercise significant oversight and discretion in the admissions process. Such oversight sometimes resulted in the admission of underqualified students over the objection of admissions officials. While Kroll determined this practice might not be a violation of any existing rules or laws, it did "not appear in UT-Austin's public representations." Chancellor McRaven received the Kroll Report, reviewed its findings, and concluded that disciplinary action was not warranted against the President or any other admissions official.

The findings of the Kroll Report became available to the public. Likewise, the names of those influential persons who wrote letters of recommendation became available to the public in response to requests made under the Texas Public Information Act. But neither the public nor the regents were given access to the hundreds of thousands of pages of documents containing student records that Kroll reviewed in coming to its conclusions. Hall wanted to review those underlying records to, among other things, assess the involvement of specific school officials, identify pressures put on admissions officials, and determine whether Kroll omitted any significant information from the report.

Hall requested access to this information from the Chancellor's office in March 2015, but McRaven resisted the request. Regents' Rule 10801 governs the procedure for dealing with information requests of this type and provides a process for when the Chancellor's "concerns about a Regent's request" remain unresolved. The Univ. of Tex. Sys., Rules and Regulations of the Bd. of Regents ("Regents' Rules"), Rule 10801 § 5.4.5. As of April 2015, Section 5.4.5 provided that,

> the matter will be presented to the Board as quickly as possible, but in no event later than 21 days from the date of the receipt of the request. For the purpose of a Board vote on this issue, the vote of any two or more Regents in support of the request is sufficient to direct that the request will be filled without delay.

*Id.* (Apr. 8, 2015). On April 8, the Board held a meeting under Section 5.4.5. Three regents (including Hall) voted to grant the request. But, importantly, the two regents joining Hall conditioned their votes on the Chancellor's office engaging in a review to determine which information was protected by FERPA.

FERPA is a federal privacy law that withholds federal funding from institutions that have a "policy or practice of permitting the release of education records . . . or personally identifiable information." 20 U.S.C. § 1232g(b)(1). FERPA, however, permits the release of these records to "other school officials . . . who have been determined by such agency or institution to have legitimate educational interests." *Id.* § 1232g(b)(1)(A).

At the time of the April vote, no Regents' Rule governed how the Chancellor's office would conduct a FERPA review. However, in the following month, the Board adopted Section 5.4.6 to Regents' Rule 10801, which specifically outlines the Chancellor's role in this review. Regents' Rule 10801 § 5.4.6 (effective May 14, 2015). Section 5.4.6 delegates the following duty:

> [T]he Chancellor, in consultation with the U.T. System General Counsel, shall determine whether State or federal law restricts compliance with the request. Accordingly, the Chancellor, in consultation with the U. T. System General Counsel, shall determine whether a Regent may review information that is protected by [FERPA] . . . .

*Id.* When the board members adopted Section 5.4.6, they also amended Section 5.4.5 to require a vote of a majority of the Board—not just two regents—to approve an unresolved request for information. *Id.* § 5.4.5 (effective May 14, 2015).

In the meantime, Hall again requested complete access, providing a list of reasons that he argued gave him a "legitimate educational interest" under FERPA. McRaven refused to provide access to the complete records, while simultaneously proposing a two-step process by which Hall could seek access to specific redacted information. First, the Chancellor's office would redact all information protected by FERPA and other privacy laws. These redactions applied to information such as students' names, grade point averages, social security numbers, and other identifying information. *See* 20 U.S.C. § 1232g(a)(4)(A) (identifying records which "contain information directly related to a student" as covered by FERPA). Then, if Hall identified specific private information and articulated a specific need, the System's General Counsel could review that request.

Unsatisfied with this proposal, Hall sued McRaven—in his official capacity as Chancellor of the UT System—for continuing to withhold access to the unredacted records. Hall sought a declaratory judgment that McRaven acted *ultra vires* in refusing to provide the unredacted information. Hall also sought a writ of mandamus or injunction to compel McRaven to provide the records.

The Board held a special meeting a few weeks later to "effect a clear and open statement of the position of the Board of Regents related to" Hall's pending litigation. A majority of the Board voted on July 8, 2015, to endorse McRaven's two-step offer of access. The Board characterized that process as follows:

> 1) access to review all confidential and nonpublic documents gathered by Kroll, with redactions only for those documents and information protected by the Family Educational Rights and Privacy Act (FERPA), the Health Insurance Portability and Accountability Act (HIPAA), or other privacy laws, as determined applicable by the Vice Chancellor and General Counsel in consultation with the System Administration Privacy Officer and Systemwide Privacy Coordinator, and
>
> 2) the opportunity for Regent Hall to identify and to discuss further, with the Chairman and the Chancellor, specific, redacted private information protected by FERPA, HIPAA, or other privacy laws in those documents which he believes are necessary to review in order to satisfy an articulated, specific need related to his official responsibilities and duties as a Regent.

The Board also voted to "delegate to the Chairman, in consultation with the Vice Chairmen and General Counsel," the authority to make the decision under step two: whether or not Hall articulated a specific need.

Following the Board's July vote, McRaven filed a plea to the jurisdiction, claiming that sovereign immunity barred Hall's suit and that the *ultra vires* exception did not apply. Hall responded to McRaven's plea to the jurisdiction and moved for summary judgment, claiming a right to the unredacted records as a matter of law. Hall asserted that as a regent he possessed an inherent right under Texas law—as outlined by an opinion from the Texas Attorney General—to access records pertinent to his duties. *See* Tex. Att'y Gen. Op. No. KP-0021, 4 (2015) (addressing whether Hall has a right to the unredacted records). He submitted that one such duty was to set admissions

standards, which invoked his inherent right to access student information unless state or federal law required otherwise. *Id.* FERPA, he argued, could not be the basis for withholding these records because his status as a regent imbued him with a "legitimate educational interest" in the information. Hall concluded that McRaven's actions in denying him complete access were *ultra vires* because McRaven had no authority to misapply FERPA and wrongfully withhold the records. The trial court held a hearing on the two motions, granting McRaven's plea to the jurisdiction and dismissing the case with prejudice. Hall appealed, and the court of appeals affirmed. ___ S.W.3d ___, 2016 WL 4979576, at *1 (Tex. App.—Austin 2016). We granted Hall's petition for review and expedited briefing and oral argument.

III

Sovereign immunity requires the state's consent before it can be sued. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). Sovereign immunity developed as a common-law doctrine in recognition of the courts' limited authority over the sovereign creating them. *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015). Its justification continues today as a means to protect the public treasury. *Id.* Consequently, the doctrine operates to "shield the public from the costs and consequences of improvident actions of their governments." *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006).

The sovereign may, however, waive or limit its immunity. But the Legislature has not waived immunity for suits like Hall's. Nevertheless, in certain narrow instances, a suit against a state official can proceed even in the absence of a waiver of immunity if the official's actions are *ultra vires*. *City of El Paso, v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). An *ultra vires* action

8

requires a plaintiff to "allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.*

We recently clarified what it means for an official to act "without legal authority." *See Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016). We said that "a government officer with some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Id.* "Ministerial acts," on the other hand, are those "where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 587 (Tex. 2015) (quoting *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994)).

The basic justification for this *ultra vires* exception to sovereign immunity is that *ultra vires* acts—or those acts without authority—should not be considered acts of the state at all. *Cobb v. Harrington*, 190 S.W.2d 709, 712 (Tex. 1945). Consequently, "*ultra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state" over one of its agents. *Heinrich*, 284 S.W.3d at 372.

IV

The court of appeals held that McRaven acted within his legal authority when he continued to withhold unredacted records from Hall. ___ S.W.3d at ___, 2016 WL 4979576, at *9. According to the court, this was "because it was the Board, through its [July] majority vote, who ultimately refused to allow Hall full access to the Kroll file without redaction." *Id.* More specifically, the court viewed the July vote as showing that the Board "implicitly determined that Hall does not have a

9

legitimate educational interest in the information and that it may be protected by other privacy laws."

*Id.* Essentially, because the Board endorsed McRaven's process, and because McRaven serves at the behest of the Board, McRaven was within his authority in refusing full access. *See id.* Both Hall and McRaven characterize this holding as indicating that McRaven was not the "proper party" to this *ultra vires* suit.

*Heinrich* is our only case to speak about a proper party in the context of an *ultra vires* suit. 284 S.W.3d at 372–73. There we clarified that the governmental entities themselves were not proper parties to an *ultra vires* suit. *Id.* Instead, a plaintiff must sue the relevant officers in their official capacities. *Id.* Of course, that is not an issue in this lawsuit. Hall sued McRaven, a state officer, in McRaven's official capacity, and McRaven is unquestionably a proper party to the *ultra vires* suit in *Heinrich*'s sense of the term. But here, the parties argue about proper parties in an entirely different sense: as a means of horizontal selection—pinpointing which official has the duty to act.

An *ultra vires* claim based on actions taken "without legal authority" has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority. *Hous. Belt*, 487 S.W.3d at 158. The proper-party plea by a state official is another way of saying a higher power has deprived the official of all of his or her discretion. In other words, the higher authority has created a *ministerial* (nondiscretionary) duty for the subordinate official to engage in conduct the plaintiff claims is wrongful. Thus, the proper-party question is nothing foreign; it goes to the first component of *Houston Belt*'s clarification of a "without legal authority" claim. *Id.* The court of appeals' discussion adheres to this framework. *See* ___ S.W.3d at ___, 2016 WL 4979576, at *9.

10

In that context, we must decide whether the Board's July vote deprived McRaven of all discretion. Hall argues it did not. We agree, at least with respect to a narrow course of action: the Chancellor's interpretation of federal privacy law. On July 8, the Board endorsed McRaven's two-step offer of access. The first of those steps, as characterized by the Board, left in place the understanding that questions of law relating to FERPA would remain "as determined applicable" by the Chancellor's office. This was made all the more clear during questioning of the UT System's General Counsel, Dan Sharphorn, at the trial court's jurisdictional hearing. When asked about the effect of the July endorsement, Sharphorn agreed that "the vote in July directed the chancellor to provide all of the information, redacting only what is required to be redacted by privacy law." Sharphorn also agreed that "the vote in July still left open the question [of] what data in the Kroll file, if any, it was legal to provide to Regent Hall." Sharphorn elaborated that his mission was to make sure it was legal to provide the information and that "the subsequent vote by the Board of Regents in July didn't change that mission." If the July vote conclusively deprived McRaven and his top legal advisor of any discretion to decide legal questions under FERPA, it was not Sharphorn's understanding. Finally, that the Board continued to delegate the duty of interpreting FERPA to the Chancellor's office is no surprise. After all, just two months prior, the Board amended the Regents' Rules to assign that precise duty to the Chancellor. *See* Regents' Rule 10801 § 5.4.6 (delegating to the Chancellor—in consultation with the General Counsel—the duty to "determine whether a regent may review information that is protected" by FERPA).

The court of appeals' opinion implies that McRaven and his subordinates had no discretion to decide the threshold question of law under FERPA because those questions were authoritatively

11

settled by the Board's July vote. \_\_\_ S.W.3d at \_\_\_, 2016 WL 4979576, at \*9 (finding that the Board's July vote "implicitly determined that Hall does not have a legitimate educational interest in the information and that it may be protected by other privacy laws"). The language of the July resolution, Sharphorn's testimony, and the explicit delegation of authority via the Regents' Rules belie any such implication. McRaven retained discretion to interpret FERPA, and, with respect to the legitimate exercise of that discretion, McRaven would remain subject to *ultra vires* principles.

But to the extent Hall's lawsuit implicates a broader indictment, we agree with the court of appeals that the Board would be to blame, not McRaven. Hall claims an unfettered right to access—one free from limits other than disclosures that would violate other laws. Hall argues further that FERPA is categorically inapplicable to a regent's request for information he finds necessary to fulfill his job. If Hall is right about those legal questions, the Board has restricted that right in two ways. First, the Board amended Section 5.4.5 of Rule 10801 to require a majority of regents to approve a request for information. Second, the Board created a governance scheme in which the Chancellor's discretionary determination of federal law can lead to redactions of information. *See* Regents' Rule 10801 § 5.4.6.

These are concrete limits on Hall's claimed right to complete access. But they are limits imposed by the Board—not McRaven. Hall did not explicitly challenge these rules in his *ultra vires* suit. Nor could he by suing McRaven alone. By its very definition, an *ultra vires* suit against McRaven can only seek to compel him to *follow* his governing authority, not to change that governing authority. *Heinrich*, 284 S.W.3d at 372 (explaining that *ultra vires* "suits do not seek to alter government policy but rather to enforce existing policy"). Because Hall chose to sue McRaven,

his complaint must necessarily be a limited one: McRaven made an allegedly incorrect determination under FERPA and that erroneous interpretation resulted in an unlawful redaction of records.

But before considering the merit of the *ultra vires* claim, we must consider Hall's alternative argument regarding McRaven's proper-party status. Hall claims that McRaven, as the highest-ranking officer of the UT System, is the proper "nominal defendant" in a suit that is functionally directed at UT as an entity. If this were true, McRaven would be the proper defendant with respect to complaints about the above decisions: ones that are attributable to the Board and no one else. For that matter, McRaven would be the proper defendant for any *ultra vires* complaint against any UT officer. But Hall's argument misunderstands the *ultra vires* exception.

Hall correctly argues that a suit against a state official in his official capacity "is merely 'another way of pleading an action against the entity of which [the official] is an agent.'" *Tex. A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Yet equally clear is the notion that "*ultra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state." *Heinrich*, 284 S.W.3d at 372. To reassert such control, an *ultra vires* suit must lie against the "allegedly responsible government actor in his official capacity," not a nominal, apex representative who has nothing to do with the allegedly *ultra vires* actions. *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 76 (Tex. 2015). Therefore, an *ultra vires* claim against McRaven must be confined to conduct pursuant to his authority: the duty to interpret and apply FERPA to information requests.

V

And so we reach the dispositive issue: whether McRaven's alleged misinterpretation of FERPA constitutes an *ultra vires* act. We hold that it does not.[1] More globally, this case implicates every mistake of law by a state official and whether such errors are always *ultra vires*, particularly in light of our opinion in *Houston Belt*.

*Heinrich* clarified two general means of proving an *ultra vires* claim: (1) an action "without legal authority" or (2) failure to "perform a purely ministerial act." 284 S.W.3d at 372. In *Houston Belt*, we addressed what it means to act without legal authority in the context of a particular type of *ultra vires* claim: an allegation that an official has exceeded his or her granted authority to "interpret and apply a law." 487 S.W.3d at 158, 160–63. We concluded that sovereign immunity "bars suits complaining of an exercise of *absolute* discretion but not suits complaining of . . . an officer's exercise of judgment or *limited* discretion without reference to or in conflict with the constraints of the law authorizing the official to act." *Id.* at 163 (emphasis in original). Although not directly applicable, we quoted for comparative purposes the rule that a public officer generally lacks discretion or authority to misinterpret the law. *Id.* (quoting *In re Smith*, 333 S.W.3d 582, 585 (Tex. 2011) (orig. proceeding)).[2]

---

[1] We do not decide what constitutes a "legitimate educational interest" under FERPA or any other questions of federal privacy law. For purposes of addressing whether Hall's *ultra vires* claim is proper, we assume for the sake of argument that McRaven and his legal advisors incorrectly interpreted FERPA.

[2] *Smith* did not concern an *ultra vires* exception to sovereign immunity because a statute in that case expressly waived the state's immunity, and the issue was whether the officer had erroneously calculated the compensation due under the statute. 333 S.W.3d at 585–87.

Hall assumes that our mention of misinterpretations of the law in *Houston Belt* necessarily means that any legal mistake is an *ultra vires* act. Not so. It is the mistake's impact on the official's authority that carries dispositive weight for *ultra vires* purposes. In *Houston Belt*, we examined an *ultra vires* claim against Houston's Director of Public Works and Engineering. *Id.* at 158. The plaintiff complained that the Director acted *ultra vires* in imposing a drainage fee based on an unlawful determination of the permeability of the plaintiff's property. *Id*. at 159. The ordinance authorizing the Director to act commanded him to make that permeability determination "on the basis of digital-map data . . . or other similar reliable data as shall be determined by the director." *Id.* Instead of using digital map data, or something similar, the Director looked at aerial photographs to make his permeability determination. *Id.* We found that while the ordinance gave some discretion to the Director, the discretion was not absolute. *Id.* at 168. Therefore, the Director's misinterpretation of his own limits in making a permeability determination was a valid basis for an *ultra vires* claim. *Id.* at 169.

Like *Houston Belt,* this case involves an *ultra vires* claim based on a state official allegedly exceeding his granted authority to "interpret and apply a law." *Id.* at 158. But the *ultra vires* claim in *Houston Belt* differs from Hall's claim in two key respects. First, the Director's misinterpretation was of the requirements of his *enabling law*. *Id.* at 158, 165 (explaining that the limits of the Director's "authority [were] found in the authority-granting law itself—the ordinance"). Consequently, when the Director misinterpreted the limits of the ordinance, he misinterpreted the bounds of his own authority—exceeding the scope of what the City permitted him to do. *See id*. *Houston Belt* synthesized several cases in reaching the conclusion that limited discretion can give

15

rise to an *ultra vires* claim. *Id.* at 162–63. Every case[3] involved an interpretation of the official's

enabling authority. *See id.* Here, McRaven's interpretation is not of his organic authority but rather

federal privacy law—a law *collateral* to McRaven's authority. It is Section 5.4.6 of Regents' Rule

10801, not FERPA, that supplies the parameters of McRaven's authority:

> [T]he Chancellor, in consultation with the U.T. System General Counsel, shall determine whether State or federal law restricts compliance with the request. Accordingly, the Chancellor, in consultation with the U. T. System General Counsel, shall determine whether a Regent may review information that is protected by [FERPA] . . . .

Regents' Rule 10801 § 5.4.6. In order to act without legal authority in carrying out a duty to

interpret and apply the law, McRaven must have exercised discretion "without reference to or in

conflict with the constraints of the law authorizing [him] to act": Section 5.4.6. *Hous. Belt*, 487

S.W.3d at 163. Without that showing, Hall would simply have no basis for "reassert[ing] control

of the state." *Heinrich*, 372 S.W.3d at 372.

Admittedly, that begs the question of whether McRaven's allegedly mistaken interpretation

of collateral law was nevertheless in violation of his enabling authority. This brings us to another

key difference between *Houston Belt* and the present case. In *Houston Belt*, the Director's

determination was subject to explicit constraints, i.e., what to consider in reaching a permeability

---

[3] *See Heinrich*, 284 S.W.3d at 369 (finding valid an *ultra vires* suit against a pension fund based on the fund retroactively lowering the plaintiff's pension in violation of its enabling statute); *Klumb v. Hous. Mun. Emp's. Pension Sys.*, 458 S.W.3d 1, 9 (Tex. 2015) (finding invalid an *ultra vires* claim against a pension fund for allegedly acting "without legal authority by expanding [the enabling statute's] definition of 'employee' without the City's approval and in conflict with the plain language of the statute"); *Emmett*, 459 S.W.3d at 589 (finding valid an *ultra vires* claim against the Harris County Commissioner's Court for failing to authorize payments that the enabling statue—the Water Code—required the Commissioners to authorize); *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 386, 393 (Tex. 2011) (implying an *ultra vires* claim might succeed against the Parks and Wildlife Department for a mistaken application of the Parks and Wildlife Code).

determination. 487 S.W.3d at 159. Neglecting one of those constraints was what made the Director's determination—whether right or wrong—*ultra vires*. *See id.* at 161. In other words, the Director's discretion was limited in *how* he reached a conclusion. *See id*. Here, McRaven is indeed tasked with making a determination. But that is it. McRaven's only duty is that he "shall determine whether a Regent may review information that is protected by [FERPA]." Regents' Rule 10801 § 5.4.6. His discretion in making that determination is otherwise unconstrained.

When the ultimate and unrestrained objective of an official's duty is to interpret collateral law, a misinterpretation is not overstepping such authority; it is a compliant action even if ultimately erroneous. Our intermediate courts of appeals have repeatedly stated that it is not an *ultra vires* act for an official or agency to make an erroneous decision while staying within its authority.[4] Indeed, an *ultra vires* doctrine that requires nothing more than an identifiable mistake would not be a narrow exception to immunity: it would swallow immunity. After all, do not all successful lawsuits require a legal wrong? As important as a mistake may be, sovereign immunity comes with a price; it often allows the "improvident actions" of the government to go unredressed. *See Tooke*, 197 S.W.3d at

---

[4] *See, e.g., Edinburg Consol. Indep. Sch. Dist. v. Smith*, No. 13-16-00253-CV, 2016 WL 3068119, at \*13 (Tex. App.—Corpus Christi May 26, 2016, no pet.) (mem. op.) (explaining that it is "clear that not all alleged errors in interpretation of law or policy constitute ultra vires acts")*; Creedmoor-Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality*, 307 S.W.3d 505, 517–18 (Tex. App.—Austin 2010, no pet.) ("These are allegations that [the agency] reached an incorrect or wrong result when exercising its delegated authority, not facts that would demonstrate [the agency] exceeded that authority."); *MHCB (USA) Leasing & Fin. Corp. v. Galveston Cent. Appraisal Dist. Review Bd.*, 249 S.W.3d 68, 81 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("Additionally, just because an agency determination is wrongly decided does not render that decision outside the agency's authority [because] an incorrect agency determination rendered *pursuant* to the agency's authority is not a determination made *outside* that authority.") (emphasis in original); *Williams v. Hous. Firemen's Relief & Ret. Fund*, 121 S.W.3d 415, 430 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("Williams does not challenge the fact that the Fund has . . . this statutory authority. . . . [T]he crux of Williams's argument is that the trustees interpreted the statute in a way they should not have. This is a complaint of 'getting it wrong,' not of acting outside statutory authority.").

332 (explaining that sovereign immunity functions "to shield the public from the costs and consequences of improvident actions of their governments"). Only when these improvident actions are *unauthorized* does an official shed the cloak of the sovereign and act *ultra vires*.

Based on the unrestricted nature of McRaven's authority under Section 5.4.6, we find his discretion to interpret collateral federal privacy law to be "absolute" under our framework from *Houston Belt*. 487 S.W.3d at 163 (explaining that sovereign immunity bars suits targeting an exercise of absolute discretion). As such, McRaven—whether right or wrong—was not without legal authority in making that determination. Nor was he without authority in redacting information once he made the legal conclusion. The Board instructed him to redact information he determined protected under FERPA, and he did just that.

Finally, did McRaven violate a purely ministerial duty*? See Heinrich*, 284 S.W.3d at 372 (explaining that the other ground for an *ultra vires* suit is a failure to perform a "purely ministerial act")*.* Perhaps it goes without saying, but if an official's duty is discretionary, it is not also nondiscretionary. The authority conferred by the Board onto McRaven is quite the opposite of "where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Emmett*, 459 S.W.3d at 587 (defining a ministerial duty). Having failed to meet either of the bases for establishing an *ultra vires* action under *Heinrich*, we conclude that Hall's case was properly dismissed.

* * *

We are not unsympathetic to Hall's plight, however. He seeks information to educate himself and his fellow regents about issues of undeniable importance to the institution. Facts are the greatest

18

ally of those, like Hall, who seek to change the minds of others. Yet the Board has instituted a governance structure that leaves Hall at the mercy of the Chancellor's discretionary legal determination, at least in the first instance. Perhaps that scheme is unwise. Perhaps it elevates the status quo above transparency. Perhaps it increases the likelihood that voices in the minority will be stifled. And perhaps it presents none of those dangers. But those questions are beyond our reach; the Legislature is the ultimate arbiter of policy at The University of Texas. In this suit we are simply tasked with assessing whether Chancellor McRaven exceeded his authority. On this record, we conclude that he did not. The judgment of the court of appeals is accordingly affirmed.

_____
John P. Devine
Justice

OPINION DELIVERED: January 27, 2017