# Supreme Court of Texas

---

No. 22-1145

---

Dianne Hensley,

*Petitioner,*

v.

State Commission on Judicial Conduct et al.,

*Respondents*

---

On Petition for Review from the
Court of Appeals for the Third District of Texas

---

JUSTICE BLACKLOCK, joined by Justice Devine, concurring.

We could have all but ended this regrettable case today. We should have done so by holding that the Judicial Conduct Commission lacks the lawful authority to sanction Judge Hensley or any other Texas judge who politely declines to perform same-sex marriages but respectfully refers same-sex couples to a nearby officiant who will gladly do so. Judge Hensley's eminently reasonable policy honored her personal convictions and showed courtesy to same-sex couples, who the U.S. Supreme Court has said are entitled to a marriage—not to a particular marriage officiant, and especially not to an officiant with religious objections to participating in the ceremony.

Judge Hensley's actions were not unethical, unconstitutional, or illegal in any way. Politely declining to participate in a same-sex wedding for religious reasons does not demonstrate bias or prejudice against gay people. Nor does it demonstrate an inability to impartially judge their lawsuits. Of course, rudely or derisively declining to participate in a same-sex wedding might demonstrate bias, but rude and derisive treatment of *anyone* is conduct beneath a judge. There is no allegation that Judge Hensley was ever anything other than polite, respectful, and forthright with the same-sex couples who crossed her path. Nor is there an allegation that any of those couples ever had any trouble obtaining a marriage because of Judge Hensley's policy.

In fact, the record contains no indication that *any* same-sex couple *ever* complained to *anyone* about Judge Hensley's respectful but principled treatment of them. And that is to their credit. By all accounts, these couples were treated courteously by Judge Hensley and her staff, and they were politely directed down the street to another officiant happy to perform their marriage. Judge Hensley even arranged for nearby private wedding officiants to charge the cheaper government rate to the same-sex couples she referred. Imagine a couple in that situation trying to coerce the courteous and helpful Christian judge to violate her convictions for their convenience, when other local officiants are happy to accommodate. What purpose could that possibly serve— other than to prove that adherents to the old orthodoxy will be made to bend the knee to the new one? I find it encouraging that we have no indication any same-sex couple even considered handling the situation that way. What decent person would? Judge Hensley treated them

respectfully.  They got married nearby.  They went about their lives. Judge Hensley went back to work, her Christian conscience clean, her knees bent only to her God.  Sounds like a win-win.

Indeed, it sounds just like what the Fifth Circuit envisioned, when it directed Texas to provide same-sex marriages because of *Obergefell v. Hodges* but cautioned that "controversies involving the intersection of" the ancient rights of religious freedom and free speech and the new right of same-sex marriage were not resolved by *Obergefell* but instead remained open to "the robust operation of our system of laws and the good faith of those who are impacted by them."  *De Leon v. Abbott*, 791 F.3d 619, 625 (5th Cir. 2015) (following *Obergefell v. Hodges*, 576 U.S. 644 (2015)).  By all accounts, Judge Hensley and the same-sex couples of the Waco area navigated the intersection of their rights just as we would expect of responsible adults in a heterogenous society. Before this case became a public spectacle, the real people in Waco actually impacted by the intersection of their potentially conflicting rights admirably treated each other with respect and good faith, just as the Fifth Circuit hoped.  So far, so good.

Enter the Texas Judicial Conduct Commission.  Apparently after combing the newspapers for juicy targets, the Commission decided, on its own initiative, to subject Judge Hensley to a lengthy private inquisition and then to publicly humiliate her.  It claimed that her marriage-referral policy "cast[s] doubt on her capacity to act impartially to persons appearing before her as a judge due to the person's sexual orientation"—even though she offered to immediately recuse herself if litigants in her court ever thought she might not treat them fairly

3

because of her marriage policy (there is no indication any litigant ever did).

Several years later, here we are. There are no victims. There was no crime. We have a Christian justice of the peace in a small Texas city doing her best to navigate her duties to God and to the public. We have no real people even claiming to be harmed by her actions. We certainly have no same-sex couples denied a marriage—or anything even close to that. There is no good reason for this case to exist.

But it does exist. It exists because of the Judicial Conduct Commission, which veered far outside its proper lane by self-initiating this victimless but politically and emotionally charged case. The Commission misinterpreted the Code of Judicial Conduct and violated Judge Hensley's religious-freedom rights by publicly sanctioning her and by continuing to hold over her head the threat of a future, harsher sanction should she resume her marriage-referral policy. To her credit, Judge Hensley did not capitulate. And for the last several years, the Commission has doubled down again and again on this misbegotten case, all the way to the Texas Supreme Court.

The irony is this. By going out of its way to take sides in a contentious moral and political debate about conflicts between the right to same-sex marriage created by *Obergefell* and the rights of religious dissenters long enshrined in our founding documents—an ongoing debate that *Obergefell* itself acknowledged would continue—the Commission has done far more, in the eyes of many Texans, to undermine public confidence in Texas's judicial branch than a lone justice of the peace in Waco ever could. It is too bad this case does not

4

end today. But it will end some day, and if Judge Hensley sticks to her guns, I am confident the Commission will lose.

\* \* \*

I agree with the Court that Judge Hensley's claims may go forward as a procedural matter. In addition to the procedural questions the Court resolves, the parties have also presented for our decision the substantive question of whether the Commission's actions violated Hensley's legal rights. The Court remands the case for the lower courts to answer the merits questions. I would instead resolve them now, as we often do when deciding appeals of jurisdictional rulings in similar procedural postures. The Commission's actions did violate Hensley's legal rights, and the procedural quirks of this case do not prevent this Court from saving everyone a lot of time and trouble by saying so now.

When a plaintiff's ultra vires claim against government officials is dismissed on jurisdictional grounds, as happened below, appellate courts commonly address the merits of the parties' competing interpretations of the law in order to determine whether the plaintiff has stated a valid claim sufficient to bypass the government's immunity. *See, e.g.*, *Phillips v. McNeill*, 635 S.W.3d 620, 631 (Tex. 2021) ("We also hold that . . . the Inspector General's failure to provide the hearing was *ultra vires* and thus not shielded by sovereign immunity. Accordingly, the trial court erred in granting the plea to the jurisdiction."); *Hall v. McRaven*, 508 S.W.3d 232, 243 (Tex. 2017) (holding that an ultra vires claim was properly dismissed on sovereign immunity grounds after examining the merits of the claim); *Hous. Belt & Terminal Ry. v. City of Houston*, 487 S.W.3d 154, 169 (Tex. 2016) (reversing dismissal of an

5

ultra vires claim on governmental immunity grounds after examining the merits of the claim).

This case is eligible for the same treatment.[1] Judge Hensley's Second Amended Petition invokes "the *ultra vires* doctrine recognized in *City of El Paso v. Heinrich*" and seeks "an injunction that will prevent the Commissioners from investigating or sanctioning judges or justices of the peace who recuse themselves from officiating at same-sex weddings on account of their sincere religious beliefs." The question, at this stage of the case, is whether the courts have jurisdiction over this claim for prospective relief. Whether the courts have jurisdiction over the claim depends, in part, on whether Hensley's petition alleges threatened actions by the Commissioners that are truly ultra vires— that is, truly outside the Commissioners' authority. *See Chambers–Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 344–45 (Tex. 2019). The Commissioners' plea to the jurisdiction, from which this appeal arises, raised this merits issue by arguing that Hensley's ultra vires claims do not allege any ultra vires conduct by the Commissioners. In similar circumstances, we often take the opportunity in appeals like this one to answer disputed merits questions about the legality of the government's actions. *See, e.g.*, *Phillips*, 635 S.W.3d

---

[1] By my reading of the parties' pleadings in the district court and the way this appeal has been postured, there are likely multiple pathways by which the Court could validly address the merits of some or all of Hensley's claims if it chose to do so. I focus on the ultra vires claim because, at least in my mind, it provides the simplest and most well-worn avenue.

6

at 631; *McRaven*, 508 S.W.3d at 243; *Hous. Belt & Terminal Ry.*, 487 S.W.3d at 169; *Chambers–Liberty Cntys.*, 575 S.W.3d at 354–55.[2]

The Court declines to do so here, even though both sides adequately briefed the merits and we could expedite the case's resolution by addressing them. I disagree with that choice, although I do not think the Court errs, as a formal matter, by declining to reach the merits. The court of appeals did not reach the merits because it ruled against Hensley on purely procedural grounds, and this Court always has the prerogative to decline to reach questions the court of appeals has not yet reached. Whether to reach the merits today is ultimately a prudential question, so the Court's reticence is not legally erroneous or altogether unjustifiable, although I disagree with it. As I see it, prudence dictates moving this case along. The merits are adequately

---

[2] The Commission argues that the ultra vires claims fail for the additional reason that section 33.006 of the Government Code grants "immunity from liability" to the Commissioners that is "absolute and unqualified." TEX. GOV'T CODE § 33.006. If this argument were correct, then we would not need to reach the merits of the ultra vires claims. In my view, it is not correct. As we said in *City of El Paso v. Heinrich* and have repeated since then, the use in ultra vires claims of nominal defendants in their official capacity as stand-ins for the governmental entity is merely a "technical matter," because "the suit is, for all practical purposes, against the state." 284 S.W.3d 366, 372–73 (Tex. 2009); *see also Chambers–Liberty Cntys.*, 575 S.W.3d at 348–49. Although the Commissioners are nominal defendants, they face no genuine personal liability by virtue of this litigation, so section 33.006 does not apply. Yet even if I am wrong about section 33.006, then as indicated above, other procedural avenues available to the Court make it possible to address the merits now, including through the TRFRA claim against the Commission itself. I do not analyze those avenues in detail because, in my mind, the ultra vires claim provides a valid basis to reach the merits.

presented, the case has already been pending for many years, and it may remain pending for many more years given today's disposition.

Also relevant to the prudential question is the constitutional relationship between this Court and the Judicial Conduct Commission. For several reasons, this Court is uniquely suited to the task of repudiating the Commission's incorrect interpretation of the Code of Judicial Conduct. To begin with, this Court promulgates the very Code that the Commission erroneously thought Judge Hensley violated. We also appoint several members of the Commission. When the Commission attempts to impose sanctions stronger than a slap on the wrist, such as suspension from office or removal, this Court has the final say. TEX. CONST. art. V, § 1-a(9). And, as the Court correctly holds today, in some circumstances judges threatened unlawfully by the Commission can seek redress through civil lawsuits, which likewise terminate at this Court. Thus, in multiple ways, our legal system gives this Court—not the Judicial Conduct Commission or lower courts—the final say on questions of judicial ethics.

We could have had the final say in Judge Hensley's case today. Perhaps another day will come—although the better course after today would be for the Commission to voluntarily rescind its warning of Judge Hensley and renounce its erroneous view that her marriage-referral policy violates the Code of Judicial Conduct.

* * *

As an initial matter, the Commission is not protected from ultra vires suits merely because the Commissioners have some discretion to interpret and apply the Code of Judicial Conduct. "The fact that the

8

official has some limited discretion to act under the applicable law does not preclude an ultra vires claim if the claimant alleges that the official exceeded the bounds of that authority, or the conduct conflicts with the law itself." *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 68 (Tex. 2018). The Judicial Conduct Commission has no more discretion to apply the Code of Judicial Conduct incorrectly than the Comptroller has to apply the Tax Code incorrectly. Both are constitutional offices charged with interpreting and applying a legal code. But neither has absolute discretion to apply its legal code just any way it chooses, and neither is immune from judicial review of its compliance with the legal code it administers. Nor does the Judicial Conduct Commission have discretion to violate the Texas Constitution, the U.S. Constitution, or the Texas Religious Freedom Restoration Act (TRFRA)—all of which Hensley alleges were violated by the Commission's past actions and threatened future actions.[3]

Turning to whether Hensley alleged genuinely ultra vires acts— that is, whether the Commission's treatment of her conflicts with the law and is therefore outside the Commission's authority—the principal reason Hensley succeeds is simple: Her courteous marriage-referral policy does not violate the Texas Code of Judicial Conduct. Politely declining to participate in a same-sex wedding for religious reasons does not demonstrate bias or prejudice against gay people. Nor does it

---

[3] *See* TEX. CODE JUD. CONDUCT, Canon 8A, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B ("The Sections are rules of reason, which should be applied consistent with constitutional requirements, statutes, other court rules and decisional law and in the context of all relevant circumstances.").

demonstrate an inability to impartially preside over their lawsuits. Likewise, publicly confessing traditional Christian beliefs about marriage and sexuality does not demonstrate bias or prejudice against gay people or demonstrate an inability to impartially preside over their lawsuits.

The Commission tries to make much of the fact that Judge Hensley publicly stated the religious reasons for her marriage-referral policy in response to inquiries from the Waco newspaper. Of course, Judge Hensley is correct that judges—particularly elected judges—are not divested of their free-speech rights when they put on the robe. *See Republican Party of Minn. v. White*, 536 U.S. 765, 788 (2002). But more to the point, everybody already knows—particularly outside Texas's big cities—that many, many judges and other local public officials hold traditional Christian religious beliefs about marriage. And everybody already knows that the reason so many of their local judges stopped performing *all* marriages after *Obergefell* is because the judges, for religious reasons, feared being compelled to perform same-sex marriages.

The public's knowledge of a judge's traditional Christian beliefs—commonplace knowledge in small cities and towns throughout Texas—does not reasonably undermine public confidence in the judiciary or cast reasonable doubt on the judge's impartiality, any more than would public knowledge that the judge is an atheist. Yes, there are plenty of people who would have less confidence in a judge they know to hold traditional Christian beliefs about marriage. This is Texas, so there are at least as many people who would have less confidence in a judge they

10

know to be an atheist. The Code of Judicial Conduct is not concerned with any of that. It is concerned with judicial behavior that *objectively* casts *reasonable* doubt on a judge's capacity to decide lawsuits impartially—not with behavior that merely causes some people, subjectively, to question the judge's partiality.[4]

It therefore does not matter that there are many people whose own biases predispose them to question a judge's impartiality once they know the judge's religious views. What matters is whether the judge objectively demonstrates an inability to set aside his personal views when necessary to properly perform the judicial function, which is to decide lawsuits impartially based on the law. There is zero evidence of any such failing on Judge Hensley's part.

Imagine a world in which Judge Hensley's public declaration of her faith *does* cast reasonable doubt on her capacity to act impartially because it causes some people to assume she will not treat gay people fairly in her courtroom. Does not my public alignment with the Republican Party cause some people to assume I will not treat Democrats fairly? It should not, but we all know that for some people it does. Particularly in a state with judicial elections, judges will always be publicly affiliated in one way or another with various viewpoints many people find distasteful. Judge Hensley respectfully and forthrightly explained her marriage-referral policy—itself quite respectful—to the local media so people in her community could

---

[4] TEX. CODE JUD. CONDUCT, Canon 4A ("A judge shall conduct all of the judge's extra-judicial activities so that they do not: (1) cast reasonable doubt on the judge's capacity to act impartially as a judge; or (2) interfere with the proper performance of judicial duties.").

11

understand the reason for her actions. Whether she had done so or not, everyone already knows that a sizeable percentage of the nearly 3,000 judges in Texas have the same Christian beliefs Judge Hensley does. If anyone suspects Judge Hensley of lacking impartiality because of what she said—or if anyone suspects any other judge of lacking impartiality because of what he personally believes about marriage—they do so without a reasonable basis, and their unreasonable suspicions are irrelevant to the proper application of the Code of Judicial Conduct.

In sum, nothing Judge Hensley did or said cast reasonable doubt on her capacity to act impartially as a judge or gave the people of McLennan County a reasonable basis to suspect her of bias or prejudice. As a matter of law, she did not violate the Texas Code of Judicial Conduct.[5] The Judicial Conduct Commission has no more authority to

---

[5] Usually, judicial review of the Commission's interpretation of the Code of Judicial Conduct will take place through the procedures contained in the Government Code and the Constitution, by which sanctioned judges may seek redress in the courts. TEX. GOV'T CODE § 33.034 (authorizing a "special court of review" to review certain minor sanctions); TEX. CONST. art. V, § 1-a(9) (permitting review by this Court of a "review tribunal" decision in cases of removal from the bench). But in some cases, like Hensley's, the ongoing threat of further sanction hanging over the judge's head due to the Commission's unlawful position is a cognizable injury that can be remedied by a civil lawsuit initiated by the judge. As the Court holds, a judge cannot use a civil lawsuit to collaterally attack a prior sanction he has chosen not to administratively appeal, but he can use a civil lawsuit to attack the Commission's erroneous view of the law if pursuing the prior administrative appeal would not necessarily have alleviated the ongoing threat to the judge posed by the Commission's error. *Ante* at 21. In other words, a judge in Hensley's situation need not reinstate her marriage-referral policy in defiance of the Commission's warning, wait for the Commission to impose an even greater sanction, and then appeal that sanction to the courts. She can instead seek to establish her rights through a civil lawsuit like this one, which seeks prospective relief from the threat of future sanction. And, because her religious-freedom rights are

12

sanction judges for non-violations of the Code of Judicial Conduct than the Comptroller has to penalize taxpayers for non-violations of the Tax Code. The Commission exceeded its lawful authority, both by publicly warning Judge Hensley for non-violations of the Code and by continuing to hold over her the threat of future sanction should she resume her lawful and reasonable marriage-referral policy. For these reasons, I would hold that Judge Hensley has stated a valid ultra vires claim against the Commissioners.[6]

\* \* \*

*Obergefell* gave same-sex couples a right to marriage. It did not give same-sex couples a right to coerce a judge with religious objections to officiate same-sex weddings. Nor did it give the Texas Judicial Conduct Commission the right to punish a Christian judge who politely directs same-sex couples down the street. *Obergefell* affected the legal landscape in many ways, but it did not change the Texas Code of Judicial Conduct. *This* Court, not the United States Supreme Court, promulgates and interprets the *Texas* Code of Judicial Conduct.

---

implicated, Judge Hensley may also pursue a TRFRA claim, by which the Legislature has authorized both retrospective and prospective relief that was not available in the administrative appeal Judge Hensley decided not to pursue. *See* TEX. CIV. PRAC. & REM. CODE §§ 110.001–.012.

[6] If Judge Hensley's actions do not violate the Code of Judicial Conduct at all, then her other claims will either succeed *a fortiori* or become unnecessary. With respect to the TRFRA claim, there is no genuine question that the Commission's actions substantially burdened Judge Hensley's free exercise of religion. *See* TEX. CIV. PRAC. & REM. CODE § 110.003(a). The contested question is whether the Commission did so "in furtherance of a compelling governmental interest." *Id*. § 110.003(b)(1). There is obviously no compelling governmental interest in misapplying the Code of Judicial Conduct.

*Obergefell* did not change what it means for a judge in Texas to "cast reasonable doubt on the judge's capacity to act impartially as a judge." Politely declining to participate in a same-sex couple's intimate ceremony *after Obergefell* is no more a violation of the Texas Code of Judicial Conduct than was politely declining to participate in such a ceremony *before Obergefell*. Likewise, both before and after *Obergefell*, a judge's public display of hostility toward any category of litigant, including gay people, could cast reasonable doubt on his impartiality in violation of the Code. Nothing of that sort is even remotely alleged against Judge Hensley.[7]

If a policy like Judge Hensley's had the practical effect of denying same-sex couples reasonable access to a marriage, which never happened in Waco, then the policy might very well pose a problem under *Obergefell*. But *Obergefell* itself acknowledges its potential to cause friction with pre-existing, far more deeply rooted constitutional principles like religious liberty and the freedom of speech. 576 U.S. at 679–80. The Fifth Circuit eloquently elaborated on that potential in *De Leon v. Abbott*, which is just as binding on the State of Texas as *Obergefell* (actually even more so, since Texas is subject to the judgment in *De Leon* but was not a party in *Obergefell*). *De Leon*, 791 F.3d at 625 ("We express no view on how controversies involving the intersection of these rights should be resolved but instead leave that to the robust operation of our system of laws and the good faith of those who are impacted by them.").

---

[7] Just as *Obergefell* did not alter the Texas Code of Judicial Conduct, neither did *Bostock v. Clayton County*, 590 U.S. 644 (2020).

14

If the Judicial Conduct Commission is correct—that is, if *Obergefell* ushered in an era in which judges who publicly espouse traditional Christian beliefs are unfit for the robe—then yet another deeply rooted constitutional principle comes into view. "No religious test shall ever be required as a qualification to any office, or public trust, in this State; nor shall any one be excluded from holding office on account of his religious sentiments . . . ."[8] TEX. CONST. art. I, § 4. Judge Hensley has been the target of a punitive administrative apparatus with the power, ultimately, to exclude her from holding office. This has happened "on account of [her] religious sentiments"—not on account of rude or insulting or unprofessional words or actions towards anybody of any sexual orientation.

Like the foundational rights of free speech and religious liberty, the constitutional prohibition on religious tests for office is yet another ancient pillar of our law with roots far deeper than same-sex marriage.[9]

---

[8] The ellipses are a courtesy to our friend from earlier, the atheist judge. *Supra* at 10–11. The entire provision reads: "No religious test shall ever be required as a qualification to any office, or public trust, in this State; nor shall any one be excluded from holding office on account of his religious sentiments, *provided he acknowledge the existence of a Supreme Being.*" (emphasis added).

[9] *Compare* Sir Edward Coke, Speaker of the Parliament of England, Three Petitions to the Queen in the House of Commons (Feb. 22, 1593), *reprinted in* 3 THE SELECTED WRITINGS AND SPEECHES OF SIR EDWARD COKE 7 (Steve Sheppard ed., 2003), https://oll-resources.s3.us-east-2.amazonaws.com/oll3/store/titles/913/Coke_0462-03_EBk_v6.0.pdf ("Now am I to make unto your maj. 3 Petitions, in the name of the Commons; 1st, That Liberty of Speech, and Freedom from arrests, according to the ancient custom of parl. be granted to your subjects . . . ."); *and* RHODE ISLAND ROYAL CHARTER (1663), *transcribed by* RHODE ISLAND STATE ARCHIVES, https://docs.sos.ri.gov/documents/civicsandeducation/teacherresources/RI-Charter-annotated.pdf ("Have therefore thought fit, and do hereby publish, grant, ordain and declare, that our royal

And, like free speech and religious liberty, the ban on religious tests can be undermined by unduly aggressive interpretations of the right to same-sex marriage announced in *Obergefell*. As the Fifth Circuit counseled, many conflicts between these principles can be respectfully resolved through "the good faith of those who are impacted by them," as Judge Hensley tried to do. *De Leon*, 791 F.3d at 625. Because of the Judicial Conduct Commission's ill-advised interference, this particular conflict must now be resolved in court. It should be resolved in Judge Hensley's favor.

I respectfully concur.

James D. Blacklock
Justice

**OPINION FILED:** June 28, 2024

---

will and pleasure is, that no person within the said colony, at any time hereafter shall be any wise molested, punished, disquieted, or called in question, for any differences in opinion in matters of religion, and do not actually disturb the civil peace of our said colony; but that all and every person and persons may, from time to time, and at all times hereafter, freely and fully have and enjoy his and their own judgments and consciences, in matters of religious concernments . . . ."); *and* U.S. CONST. art. VI, cl. 3 (1788) ("[N]o religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."); *and* U.S. CONST. amend. I (1791); *and* TEX. CONST. art. I, §§ 4, 6, 8 (1876); *with Obergefell*, 576 U.S. at 681 (decreeing a right to same-sex marriage in 2015).

16