# Supreme Court of Texas

No. 21-0358

James Robert Jones and Allen Watson,

*Petitioners,*

v.

Sylvester Turner, in His Official Capacity as
Mayor of the City of Houston, et al.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued February 22, 2022**

JUSTICE LEHRMANN delivered the opinion of the Court.

This case presents issues of taxpayer standing and governmental immunity. Two Houston taxpayers sued the mayor and the city councilmembers for allegedly misallocating tax revenue in Fiscal Year 2020, in violation of the City Charter. They complain that the Charter requires a certain amount of tax revenue to be allocated to a fund used exclusively for drainage and street maintenance and that the city officials illegally directed a portion of that money to other city

services. The taxpayers claim that the officials acted *ultra vires* in spending the tax revenue at issue on anything other than the drainage fund. The officials filed a plea to the jurisdiction asserting governmental immunity, and the trial court denied the plea. The court of appeals held that the taxpayers lacked standing and dismissed the case without reaching the immunity issue.

We hold that the taxpayers have standing to assert their claims and sufficiently pleaded *ultra vires* acts. We therefore reverse the court of appeals' judgment and remand to the trial court for further proceedings.

## I. Background

In the November 2018 election, the City of Houston's Proposition A passed by a 74% majority vote. The proposition amended the City Charter by adding Article IX, Section 22, which established the Dedicated Drainage and Street Renewal Fund. The Fund ended the City's former practice of issuing bonds and incurring debts to fund drainage and street maintenance, replacing it with a pay-as-you-go method of funding. HOUSTON CITY CHARTER art. IX, § 22(a). That funding is allocated from several sources. *Id.* § 22(b). At issue in this case is the allocation from one of those sources, namely, the city's ad valorem tax levy, which comes from property tax revenue. *Id.* § 22(b)(iii).

Section 22 requires that, aside from a relatively small portion, the Fund "shall be used exclusively" for drainage and street costs. *Id.* § 22(b). Included in the amount that must be allocated to the Fund is "[a]n amount equivalent to proceeds from $0.118 of the City's ad valorem

2

tax levy" minus debt service on outstanding bonds or notes for drainage and streets. *Id.* § 22(b)(iii). The standard method of designating the amount of the tax levy is in terms of an amount per $100 of the value of the property being taxed (e.g., in 2010, the tax rate was $0.63875 per $100 of valuation). Accordingly, the parties agree that Section 22's reference to $0.118 means 11.8 cents per $100 of property value. The funding derived from the ad valorem tax levy is "included in those revenues limited by this Charter." *Id.* § 22(d).

In turn, tax revenues are limited by Article III, Section 1 of the Charter, the so-called "revenue cap." Section 1(a) provides that, absent voter approval to the contrary, the City shall not "levy ad valorem taxes at combined rates expected to result in total ad valorem tax revenues . . . that exceed the lower of" two different "indexed" amounts. *Id.* art. III, § 1(a) ("In each subsequent fiscal year [after the fiscal year ending June 30, 2005], the allowable ad valorem tax revenues shall be the prior fiscal year's indexed ad valorem tax revenues."). The first is the "allowable ad valorem tax revenues increased by the rate of inflation . . . plus the rate of growth in the City's population." *Id.* § 1(a)(i). The second is the "amount of total ad valorem taxes, both current and delinquent, actually collected during the prior fiscal year, increased by 4.5% of that amount." *Id.* § 1(a)(ii). If the voters approve "an increase in total ad valorem tax revenues" above Section 1(a)'s limits, the total ad valorem revenues so approved "shall become the amount to be adjusted in (a)(i) and (a)(ii)." *Id.* § 1(a). The City Council is authorized under Section 1 to adopt procedures "as necessary to implement this section" and "shall have full authority to assess and

3

collect any and all revenues of the city without limitation, except as to ad valorem taxes and water and sewer rates." *Id.* § 1.

For Fiscal Year 2020, City Council approved an allocation of approximately $47 million in ad valorem tax revenue to the Fund. Houston taxpayers James Robert Jones and Allen Watson (Taxpayers) sued the mayor and the city councilmembers (City Officials) in their official capacities.[1] Taxpayers allege that, according to their calculations, the City Officials underfunded the Fund by almost $50 million and in doing so violated the Charter and acted *ultra vires*. Taxpayers request declaratory, injunctive, and mandamus relief preventing the City Officials from reducing the amount contributed to the Fund to an amount less than that mandated by the Charter. Taxpayers also seek their attorney's fees.

Taxpayers' original petition reflects their calculation of the amount they allege should have been allocated to the Fund, which they have maintained throughout the proceedings. They begin their calculation with the Fiscal Year 2020 total "assessed taxable property value" of $214 billion, a value they assert takes into account any exemptions and revenue caps. They then multiply that $214 billion by $0.118/$100, per Section 22's allocation, arriving at $252,520,000. From that number they subtract the debt service amount, per

---

[1] The named defendants are Sylvester Turner, in his official capacity as Mayor of the City of Houston, and Dwight Boykins, Martha Castex-Tatum, Karla Cisneros, Ellen R. Cohen, Jack Christie, Jerry Davis, Amanda Edwards, Robert Gallegos, Mike Knox, Michael Kubosh, Mike Laster, Steve Le, Dave Martin, David Robinson, Brenda Stardig, and Greg Travis, in their official capacities as City Councilmembers of the City of Houston.

4

Section 22(b)(iii). They thus arrive at $96,665,000, the amount they allege should have been allotted to the Fund for Fiscal Year 2020.[2] In their brief in this Court, Taxpayers further present an alternative calculation by which they arrive at a similar number from a different starting point—the Fiscal Year 2020 total ad valorem tax proceeds of $1,215,687,000, which they again assert takes into account the revenue cap, property valuations, tax protests, and exemptions. They assert that this amount reflects the actual collections expected based on a $0.56792 tax levy, and that $0.118 of that $0.56792—i.e., .118/.56792—must go to the Fund. Thus, they calculate $1,215,687,000 x (.118/.56792) = $252,590,269.76. Subtracting the debt service from that amount, Taxpayers reach an allocation of $96,735,269.76 to the Fund from the ad valorem tax proceeds.

The City Officials filed a plea to the jurisdiction asserting governmental immunity. They argued that Taxpayers were merely claiming the City Officials failed to implement the Charter's provisions as Taxpayers would have liked, rather than demonstrating that the City Officials acted outside of their authority. At the hearing on the plea to the jurisdiction, the City Officials presented several exhibits, including

---

[2] Taxpayers' petition states that the debt service amount is $161,226,060, but in this Court the parties appear to agree that the correct number is $155,885,000. Because of that discrepancy, the petition states that $91,293,940 should have been allotted to the Fund, but Taxpayers argue here that subtracting the correct debt service amount yields $96,665,000. To the extent corrections to the pleadings are necessary to address this discrepancy, they may be accomplished on remand. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004) (holding that plaintiffs have an opportunity to amend their pleadings so long as they "do not affirmatively demonstrate incurable defects in jurisdiction").

5

budget sheets and other documents related to various city funds, "to demonstrate to the Court that this is not third grade math" but rather involves "very complicated" calculations that require the City Officials' exercise of discretion. One of the documents indicates that the contested $47 million allocation to the Fund was calculated by subtracting the debt service amount from $202,988,000, described as the "$0.118 equivalent of City's Ad Valorem Tax Levy," but the document provides no detail as to how the officials arrived at that number. The trial court denied the plea to the jurisdiction.

On appeal, the City Officials maintained their entitlement to immunity and argued for the first time that Taxpayers lacked standing to bring the suit. Addressing only the standing argument, the court of appeals reversed. 617 S.W.3d 894, 897 (Tex. App.—Houston [14th Dist.] 2020). The court held that Taxpayers failed to satisfy their burden to show that they are seeking to enjoin the illegal expenditure of funds, a necessary component of taxpayer standing. In fact, the court concluded, Taxpayers had "not sought to enjoin the expenditure of any funds at all" but rather to enjoin alleged underfunding. *Id.* at 896. Because the court of appeals held that Taxpayers had not established taxpayer standing and had not otherwise shown a particularized injury, the court dismissed the case for want of jurisdiction without reaching the immunity issue. *Id.* at 896–97. We granted Taxpayers' petition for review.

## II. Taxpayer Standing

Generally, parties do not have standing to sue unless they can show, among other things, that they have "suffered a particularized

6

injury distinct from that suffered by the general public." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555–56 (Tex. 2000). However, Texas law recognizes a "long-established exception" for taxpayers, who may sue "to enjoin the illegal expenditure of public funds" without showing a particularized injury. *Id.* at 556. To have standing as a taxpayer to challenge government expenditures, a plaintiff must show two things: "(1) that the plaintiff is a taxpayer; and (2) that public funds are expended on . . . allegedly illegal activity." *Williams v. Lara*, 52 S.W.3d 171, 179 (Tex. 2001). It is undisputed that Taxpayers meet the first prong, so their standing as taxpayers hinges on the second requirement.[3]

Construing Taxpayers' pleadings liberally in their favor, we hold that Taxpayers have pleaded sufficient facts for taxpayer standing. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009) (explaining that in determining "if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause," "we construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent"). Taxpayers pleaded that the City Officials allocated $47 million of the ad valorem tax levy to the Fund when, according to Taxpayers'

---

[3] The City Officials oddly argue that Taxpayers failed to "raise[] or preserve[]" the standing issue. Leaving aside that the City Officials, not Taxpayers, are the parties complaining about standing, standing is a component of subject-matter jurisdiction that may be raised at any time. *Garcia v. City of Willis*, 593 S.W.3d 201, 206 (Tex. 2019) (noting that courts are "duty-bound to determine whether [standing] exists" even if the parties do not raise it). The City Officials also argue that because the funds for Fiscal Year 2020 have already been spent, the issue is moot. However, Taxpayers are seeking prospective relief for future allocation of funds.

7

calculation, the officials were required to allocate almost $97 million. That is a measurable, and by no means *de minimis*, shortfall. *See Andrade v. Venable*, 372 S.W.3d 134, 138 (Tex. 2012) (holding that the illegal expenditure must be significant, not *de minimis*). And Taxpayers allege that the City is "*actually* spending" the money because the collected funds are being spent on city services that would not have received those funds had the City properly allocated them. Finally, Taxpayers allege that the misallocation is illegal because Article IX, Section 22 of the City Charter mandates that the Fund be spent "exclusively" on drainage and street maintenance, meaning the City Officials had no authority to allocate the money designated for the Fund elsewhere and violated the Charter in allegedly doing so.

The City Officials argue that no expenditures and no illegal activities have been alleged; rather, they maintain that the City merely *allocated* money on "related legal activity"—here, other *lawful* city services. *See Venable*, 372 S.W.3d at 138. We disagree.

First, whether the issue is characterized as making expenditures on services other than drainage and street maintenance in violation of the City Charter or failing to expend as required by the City Charter is merely a matter of semantics. Either way, the City is collecting tax dollars that allegedly are not being spent in accordance with the City Charter's express mandate. The rationale underlying taxpayer standing applies equally in either case: "protect[ing] the public from the illegal expenditure of public funds without hampering too severely the workings of the government." *Blue*, 34 S.W.3d at 556. In any event, in this case, the allegation that the City is allocating too little to the Fund

necessarily carries with it an alleged expenditure elsewhere. It is undisputed that money *not* allocated to the Fund was allocated to and spent on other services that otherwise would not have received that money.

Because Taxpayers allege that a considerable amount of taxpayer money is being spent in a manner that violates the City Charter, the City Officials' argument that the funds are being spent on "related legal activity" is inapposite. *See Venable*, 372 S.W.3d at 138. Although the city services to which the disputed funds have been allocated are themselves lawful, the allegedly unlawful act was budgeting (and spending) any money that should have been allocated to the Fund on any service other than drainage and street maintenance because that act violates the City Charter. The City Officials' reliance on *Venable* and *Lara* is therefore misplaced.

We emphasize that we do not hold a taxpayer has standing to challenge every use (or nonuse) of taxpayer money of which he does not approve. But when the law requires that a certain amount of money be directed to a specific service, and the plaintiff alleges that it is being directed and spent elsewhere, the taxpayer has alleged an illegal expenditure sufficient to confer taxpayer standing.

The City Officials' remaining standing arguments are similarly unconvincing. First, they imply that taxpayer standing is categorically unavailable when the plaintiff asserts an *ultra vires* claim. However, the City Officials cite nothing in support of this proposition beyond general standing principles, which encompass an express exception for taxpayer standing. They also argue that Taxpayers failed to identify a

9

measurable amount of funds expended on other specific services, and that because money is fungible they could not do so if they tried. But Taxpayers *have* identified a specific amount of funds—almost $50 million—that they allege should have been allocated to the Fund and instead were spent elsewhere. Even if Taxpayers cannot specifically track every missing dollar, they can show that the tax revenue was acquired and quantify the amount allegedly missing from the Fund. The amount missing, if any, amounts to a measurable expenditure on other services even though each dollar is fungible with any other in the budget. The court of appeals therefore erred in dismissing the case on standing grounds.

### III. Governmental Immunity

Because the court of appeals disposed of the case on taxpayer-standing grounds, it did not address whether Taxpayers had sufficiently pleaded and presented evidence of an *ultra vires* claim to defeat the City Officials' entitlement to governmental immunity. In the interest of judicial economy, we will address the issue in the first instance. *See First Baptist Church of San Antonio v. Bexar Cnty. Appraisal Review Bd.*, 833 S.W.2d 108, 111 (Tex. 1992) (noting that this Court may, in the interest of judicial economy, either review or remand issues not considered in the court of appeals).

Governmental immunity generally bars suits for monetary damages against public officials, but governmental immunity does not bar prospective relief against government officers acting *ultra vires*, i.e., outside their legal authority. *Heinrich*, 284 S.W.3d at 368–69, 372. To demonstrate that government officers are acting *ultra vires*, a plaintiff

10

must show that the officers "acted without legal authority or failed to perform a purely ministerial act." *Id.* at 372. Thus, an *ultra vires* claim may not be maintained if the officials' acts are within their discretion; the plaintiff must show that the officers failed to perform a purely ministerial act or acted *outside* the scope of their allotted discretion. *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 163 (Tex. 2016). And while an act within the officials' discretion is protected by immunity even if it is erroneous, *Hall v. McRaven*, 508 S.W.3d 232, 242–43 (Tex. 2017), officials generally have no discretion to misinterpret the law, *Houston Belt*, 487 S.W.3d at 163.

At the plea to the jurisdiction stage, governmental officials may challenge jurisdiction based solely on the pleadings or may challenge jurisdictional facts. *Heinrich*, 284 S.W.3d at 378. When the pleadings are challenged, we review whether the alleged facts, if true, affirmatively demonstrate jurisdiction; because we construe pleadings liberally in favor of the pleader, we will grant a plea to the jurisdiction without an opportunity to replead only if the pleadings affirmatively negate jurisdiction. *Houston Belt*, 487 S.W.3d at 160. When jurisdictional facts are challenged, we consider relevant evidence in the record and will grant the plea only if there is no question of fact as to the jurisdictional issue. *Heinrich*, 284 S.W.3d at 378. "This standard mirrors our review of summary judgments," such that we take as true all evidence favorable to the nonmovants, and we indulge every reasonable inference and resolve any doubts in their favor. *Id.*

The City Officials' plea to the jurisdiction purported to challenge both Taxpayers' pleadings and the existence of jurisdictional facts.

11

Though they did not attach any evidence to their plea, they did present exhibits at the hearing that are included in the reporter's record, and Taxpayers did not object to those exhibits. Accordingly, we will address both the pleadings and the evidence of jurisdictional facts.

Taxpayers pleaded that the City Officials "have no discretion to calculate" the Fund allocation beyond the Charter's "straightforward mathematical formula." They allege that the $0.118 allocation under Section 22 is a fixed number, not a percentage, that must be used to fund drainage and street maintenance. Their claim is that the City Officials violated that mandate by allocating less than the full $0.118 amount to the Fund. The City Officials respond that the petition does not challenge their authority to decide how to apply municipal law. Instead, they characterize Taxpayers' claim as nothing more than a complaint that the City Officials calculated the Fund allocation, pursuant to their necessary discretion, in a way that differs from Taxpayers' preferred method. We disagree.

"*Ultra vires* claims depend on the scope of a state official's authority," and the City Charter defines the scope of the City Officials' authority here. *See Hall*, 508 S.W.3d at 234. Section 22 says the Fund "shall be funded" by "an amount equivalent to proceeds from $0.118 of the City's ad valorem tax levy," and that the money allocated to the Fund "shall be used exclusively" for drainage and street costs. HOUSTON CITY CHARTER art. IX, § 22(b). The City Officials have no discretion but to allocate the funds as mandated: either they have properly allocated the funds, or they have not.

12

The City Officials argue that they have discretion in how they allocate the funds because the Article III, Section 1 revenue cap and the Article IX, Section 22 ad valorem-revenue allocation provisions are in tension and must be reconciled. They assert that Taxpayers did not take the revenue cap into account in their pleadings but that Taxpayers now admit the cap applies. Thus, the City Officials contend that Taxpayers concede the City Officials have discretion to incorporate the cap into the Fund allocation's calculation.

While Taxpayers and the City Officials agree that the revenue cap must be taken into consideration in calculating the Fund allocation, that is not the end of the story. Contrary to the City Officials' contention, Taxpayers have maintained a consistent position on the proper calculation throughout the proceedings. They allege and argue not that the cap doesn't apply, but that the City Officials are applying it incorrectly. As noted, Taxpayers explain how their calculation takes the revenue cap into consideration and reaches a number well above that presented by the City Officials. Specifically, they assert: the revenue cap places a ceiling on the total amount of ad valorem tax revenue that may be collected after taking into account protests and exemptions; the City sets the ad valorem tax rate based on that capped revenue number; and $0.118 of that amount must be allocated to the Fund. Taxpayers have not conceded their position by agreeing that the revenue cap applies, and they have at least *pleaded* that, taking the revenue cap into consideration, the City Officials allocated an insufficient amount to the Fund in violation of the City Charter.

Moreover, although the City Officials generally argue that Taxpayers' calculation is simplistic and incorrect, we are unable to discern from their briefing precisely how the City Officials' understanding of the calculation method differs from the method Taxpayers have advanced. The City Officials argue that applying the revenue cap outlined in Article III, Section 1 produces an "indexed amount" that the total ad valorem tax proceeds may not exceed, that the tax rates are adjusted accordingly, and that an amount equivalent to $0.118 of the capped proceeds must then be budgeted to the Fund. Thus, the City Officials and Taxpayers seem to agree that, one way or another, ad valorem tax revenue is capped, and the $0.118 multiplier applies to the capped amount. But according to the City Officials, the resulting calculation yields $47 million, and according to Taxpayers, the calculation yields almost $97 million. The discrepancy appears to stem from different understandings of how to take the revenue cap into account.

According to the City Officials, Taxpayers have applied the $0.118 multiplier to an erroneous "base amount" that is "grounded in raw tax valuations," while the City Officials have applied it to the proper "indexed base amount" that is grounded in final valuations and the revenue cap. Perhaps that is true, and perhaps the fact of the matter is that the City Officials properly allocated ad valorem tax proceeds to the Fund, in which case Taxpayers' *ultra vires* claim fails on its merits.[4] But

---

[4] Taxpayers cite a press release in which the Mayor allegedly admitted that the City Officials did not properly allocate ad valorem tax revenue to the

14

we cannot glean from the briefing or the evidence precisely how the City Officials calculated the allocation, whether they did so in the manner they themselves argue the Charter requires, or whether their calculation method conforms to the Charter's requirements. As a result, we cannot say the City Officials have met their burden for dismissal on a plea to the jurisdiction. *See Heinrich*, 284 S.W.3d at 378.

The City Officials insist that they *have* conclusively negated the alleged facts underlying the *ultra vires* claim, relying principally on a page from the City's September 2019 Monthly Financial Report indicating the projected Fiscal Year 2020 Fund allocation was calculated as follows:

|  | FY2020 | | |
|---|---|---|---|
|  | Adopted Budget | Projection | Year to Date Actual |
| Property Tax Revenue - General Fund ($0.118 equivalent of City's Ad Valorem Tax Levy) | $ 202,988 | $ 202,988 | $ 0 |
| Less Street & Drainage Debt Service (General Fund) | (155,885) | (155,885) | 0 |
| Captured Revenues [2] (to be transferred to Dedicated Drainage & Street Renewal Fund) | $ 47,103 | $ 47,103 | $ 0 |

Note:
Ordinance 2010-879 requires funding in the amount equivalent to proceeds from $0.118 of the City's ad valorem tax levy minus an amount equal to debt service for drainage and streets to the Dedicated Drainage & Street Renewal Fund. Total outstanding debt payable from ad valorem taxes (as of September 30) is $3.889 billion. The portion of the debt associated with drainage and street improvements is estimated at $1.025 billion.

---

Fund. The City Officials respond that Taxpayers misconstrue the language in the press release to twist it into "some sort of admission" of a violation of the Charter. We need not address the effect, if any, of the press release to conclude that a fact issue exists.

15

According to this document, the City Officials reached the disputed $47 million figure[5] by subtracting the undisputed debt service amount ($155,855,000) from $202,988,000, described in the document as "Property Tax Revenue – General Fund ($0.118 equivalent of City's Ad Valorem Tax Levy)." But again, the document provides no detail as to the source of that number, at what point or to what funds the revenue cap was applied, or any other relevant calculations. We cannot discern from that document or the City Officials' other exhibits[6] or arguments whether the starting point for Taxpayers' calculation was erroneous or, relatedly, whether the City Officials' starting point was correct.

In sum, on this record we are unable to resolve the legal question of how to calculate the appropriate allocation of ad valorem tax revenue to the Fund. Nor have the City Officials conclusively demonstrated that no genuine fact issue exists as to how they actually allocated the funds in Fiscal Year 2020. For both of these reasons, dismissal is unwarranted at this stage. However, we emphasize that, in agreeing with the trial court's denial of the plea to the jurisdiction, we do not imply that Taxpayers will ultimately succeed on the merits of their claim. We

---

[5] The amounts in the document are "expressed in thousands."

[6] The entire Monthly Financial Report, of which the above-referenced document is a part, was admitted as an exhibit at the hearing. The report is very dense, spanning fifty-four pages, and the City Officials direct us to no portions of the report providing the missing details. After oral argument before this Court, the City Officials filed a supplemental letter that included a one-page "demonstrative exhibit" containing new information about their calculation methods. That information was not before the trial court and is therefore not properly before us. Even if we were to consider the exhibit, however, we cannot glean sufficient information from it to resolve the open legal and factual questions regarding the City Officials' calculations.

simply hold that at this stage of the litigation, the record does not support granting the City Officials' plea.

## IV. Declaratory and Mandamus Relief

The City Officials argue in the alternative that Taxpayers' claims for mandamus and declaratory relief are improper and must be dismissed. The City Officials' mandamus argument mirrors their *ultra vires* argument: they assert that Taxpayers have not pleaded that the City Officials failed to perform a ministerial duty or committed a clear abuse of discretion. *See Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992) (explaining that mandamus relief is appropriate to correct a clear abuse of discretion when there is no adequate remedy at law). This argument fails for the reasons discussed above.

Finally, the City Officials argue that the declaratory-judgment claim must be dismissed because the declaratory relief Taxpayers seek is duplicative of the relief they seek by injunction or mandamus. *See Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 79 (Tex. 2015) (explaining that "courts will not entertain an action brought under the UDJA when the same claim could be pursued through different channels"). We agree with Taxpayers that at this stage, it is premature to dismiss the request for declaratory relief on the grounds asserted. It is certainly possible that if Taxpayers prevail, they could be awarded relief that would render a declaratory judgment redundant and thus improper. But the trial court did not err in declining to dismiss the claim on a plea to the jurisdiction.

## V. Conclusion

We hold that by alleging that taxpayer funds are being spent in contravention of a City Charter provision requiring that they be spent exclusively for drainage and street maintenance, Taxpayers have alleged an illegal expenditure sufficient to support taxpayer standing. We further hold that the City Officials are not entitled to dismissal of Taxpayers' *ultra vires* claim on governmental immunity grounds at this time. Accordingly, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 3, 2022