In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00111-CV**

_____

**CITY OF PORT ARTHUR, TEXAS AND ALBERTO ELEFANO,
IN HIS OFFICIAL CAPACITY,**
**Appellants**

**V.**

**KIRK C. THOMAS, Appellee**

**On Appeal from the 136th District Court
Jefferson County, Texas
Trial Cause No. D-206469**

**OPINION**

Kirk C. Thomas sued the City of Port Arthur, Texas ("the City") and Alberto Elefano, the City's Director of Public Works, (collectively, "Appellants") when Appellants attempted to enforce ordinances regulating the use of heavy vehicles on a city street adjacent to his property. Thomas operated a landfarm where he disposed of water-based drilling mud from oil and gas operations. Thomas complains that

1

Appellants' enforcement effectively prevented his customers from disposing of the drilling mud by cutting off the only access to his property, and the City singled him out for disparate treatment. Thomas further contends that to the extent Appellants' enforcement attempts interfere with his landfarming operations they are expressly preempted by Texas Natural Resources Code section 81.0523. *See* Tex. Nat. Res. Code Ann. § 81.0523. Thomas sued the City for injunctive relief asserting multiple causes of action and Elefano in his official capacity for *ultra vires* actions. Appellants appeal the trial court's denial of their Amended Plea to the Jurisdiction. In two issues and multiple sub-issues, Appellants challenge the trial court's denial of their Amended Plea to the Jurisdiction on each of Thomas's causes of action and challenge the trial court's jurisdiction to provide equitable relief by enjoining the City's enforcement of a penal ordinance. For the following reasons, we will affirm in part and reverse and render in part.

## I. Factual Background

Thomas owns a tract of land in Port Arthur that has been in his family since around 1913. Thomas estimated twenty to twenty-five oil and gas pipelines run through the property. Recently, Enterprise began building a pipeline through Port Arthur, and a portion of that pipeline runs through Thomas's property. In 2018 or 2019, Thomas began using his property for landfarming, which is the process of disposing of used drilling mud onto the ground and working or tilling it into the soil.

2

The Texas Railroad Commission ("RRC") regulates the landfarming process, and companies generating the drilling mud must obtain a RRC permit to landfarm at a particular location. Likewise, the contractors disposing of the drilling mud and their haulers must obtain waste hauler permits.

Historically and primarily, prior to 2018, Thomas's property had been accessed in two ways. The first route came off West Port Arthur Road and used a wooden bridge to cross a canal. The second route also came off West Port Arthur Road, crossed a set of railroad tracks, then proceeded across Valero-owned property containing a pipeline corridor, and finally, onto a "white bridge" (built by Thomas) crossing over a Lower Neches Valley Authority ("LNVA") canal. [1] It should be noted that West Port Arthur Road was approved for heavy load trucking by the City of Port Arthur. Thomas explained that in the past, trucks accessed his property by the wooden bridge but described the activity as "fairly minimal." These two routes were problematic for heavy truck traffic for several reasons. Thomas testified that the old "wooden bridge" had fallen into disrepair and had been condemned. Thomas testified that the second route crossing the white bridge was not an option, as loaded

_____

[1]The record also briefly mentions pipeline companies accessing the property by "matting in" from Highway 365. This was not discussed in detail, and while it happened before they began using a third route via another street, Sassine Avenue, to access the property, the exact time period the companies "matted in" from Highway 365 or from what location off of Highway 365 is unclear.

3

eighteen-wheelers had difficulty crossing the tracks due to the slope, and he relayed an instance where one loaded truck had become stuck on the tracks and another truck had flipped. Additionally, although Valero had not officially prohibited him bringing heavy trucks across the pipeline corridor, they did not like heavy trucks going across the pipelines. Finally, LNVA had provided Thomas a use agreement when he built the "white bridge" over the canal, which was limited to regular vehicles and did not allow for loaded heavy trucks to cross. Thomas explained, "LNVA did put restrictions on it. They didn't say never do anything, never haul anything across it. There is occasional times that we have and we do. But, they don't want heavy traffic being that I built it and it is a private access they granted to me."

The third route, and the one in dispute, involved heavy trucks using Sassine Avenue, a residential street, to access Thomas's property to deposit the drilling mud for the landfarming activities. However, it should be noted that Sassine Avenue (Sassine) is not approved for heavy load trucking by the City of Port Arthur. For years, there was no access from Sassine onto Thomas's property, as Thomas did not own the adjacent lots until 2007. Thomas testified he purchased these lots so he could access the property from Sassine. Further, photographic evidence shows a heavily wooded area between Sassine and the canal created a barrier preventing vehicles from accessing Thomas's property. After Thomas purchased the lots in 2007 but before the driveway was built in 2018, Thomas or contractors cleared the

4

land and installed mats, temporarily allowing trucks to enter the lots and then his property after coming in from Sassine.

Thomas testified that the pipeline companies accessed property he used for his landfarming operation via the lots off Sassine, and they occasionally brought in heavy indivisible loads containing equipment to work on the pipelines. Thomas testified that if contractors needed to come onto his property before he and Florida Gas built the driveway connecting to Sassine, they used Sassine and matted in. However, once Thomas and Florida Gas built the driveway connecting Thomas's property to Sassine, matting was no longer required.

In 2018, when Enterprise began constructing the pipeline relevant to Thomas's operation of his landfarm, Larrett Energy was the contractor performing the work. Larrett obtained a RRC permit for the project's drilling mud disposal and contracted with Thomas to dispose of the drilling mud generated by the construction of the pipeline. Larrett's representative, Daniel Eklund, testified he was familiar with the pipeline route, and in his opinion, to fulfill his contract with Thomas there were no other routes except Sassine that were not "hindersome or cumbersome" to what they were trying to haul; other routes were less desirable because they would have to resort to hauling small amounts or use roads that could not handle the weight.

In early 2020, residents living on Sassine complained to the City about the frequent heavy truck traffic on the street. The City, through Elefano, sent a "cease

5

and desist" letter for the heavy truck traffic on Sassine and cited City Ordinances 106-7 and 106-8.

Thomas testified that upon receiving the cease and desist letter, he went to the City to determine what needed to be done. Additionally, Eklund on behalf of Larrett emailed Elefano, apologized for the unpermitted use of Sassine, and he requested a permit. Elefano advised Eklund that unless every resident on Sassine approved the heavy trucks, Larrett could not use that route to access Thomas's property. In his affidavit supporting the City's Amended Plea to the Jurisdiction, Elefano claimed he misspoke and was mistaken when he said this.

The City ordinances at issue govern the use of streets by commercial vehicles and the use of certain designated roadways by construction companies. Section 106-7 governing the use of City streets by commercial vehicles provides:

> (a) The chief of police, or his designee and the director of public works are authorized to determine and designate those streets upon which commercial vehicles exceeding 10,000 pounds may be prohibited from operating.
>
> (b) The chief of police and the director of public works are authorized to determine and designate those statutes [sic] on which the through movement of tracks [sic] between the streets is prohibited.
>
> (c) Motor buses or vans may be operated on any of the above-designated streets for the transportation of passengers.

Port Arthur, Tex., Code of Ordinances ch. 106, art. I, § 106-7 (1961). Section 106-8

governs the use of certain designated roadways by construction companies and

provides:

> (a) Notwithstanding the provisions of subsection 106-7(a), no person shall operate construction equipment and vehicles in excess of the legal load limits on streets other than those designated for commercial vehicles, except in accordance with following provisions: In connection with the following agreement, the applicant shall furnish at his expense a corporate surety performance bond, as set forth in the prescribed agreement, in an amount determined by the department of public works, based on the estimated cost to the city, at the time of the agreement, for materials, labor and equipment which would be reasonably necessary to reconstruct the particular roadway covered by the agreement, i.e., the city's prevailing contract cost of like materials, the city's prevailing salary costs and the city's prevailing schedule of operating costs and/or the prevailing rental costs of equipment. Contractors desiring to operate construction equipment and heavy trucks exceeding 10,000 pounds gross weight, but not to exceed 48,000 pounds gross weight or 18,000 pounds axle weight on streets other than designated truck routes, shall first make application with the director of public works, specifying the particular area of construction and the time necessary to complete the work. Upon receipt, the director of public works shall ascertain and designate the particular roadways capable of sustaining the excess load and the duration, and thereafter cause to be executed an agreement between the contractor and the city.
>
> (b) Any person who violates any provision of this section, or who shall fail or neglect to comply with the terms of this section, shall be deemed guilty of a misdemeanor and shall, upon conviction, be fined not less than $100.00, nor more than $200.00.

*Id.* § 106-8.

Even though these ordinances existed, Elefano testified that he had not issued

any road use permits for anyone before Thomas, and the process was "relatively

7

informal." In early 2020, when the City became aware through citizen complaints of the heavy trucks on Sassine, it sent a letter to Thomas informing him a permit would be required to operate heavy trucks on Sassine. Given the "relatively informal" process at the time, Thomas provided information about the project and its duration. In response, the City gave Thomas written authorization to use Sassine for heavy truck hauling for ten days and required him to post a $150,000 bond. Thomas completed that project within the ten days, after which the City tried to collect on Thomas's $150,000 bond. However, the bonding company denied the City's claim, contending the City failed to prove Thomas's trucks were the cause of the damages the City occurred to its street.

Elefano averred in his affidavit that in the fall of 2020, neighbors again began complaining of heavy trucks hauling materials to and from Thomas's property via Sassine and expressed concerns the heavy traffic was damaging the street. Elefano also swore that neither Thomas nor any other contractor had obtained a permit to use Sassine for heavy truck traffic. The City's police department began issuing citations to unauthorized trucks operating on Sassine. In October 2020, Eklund contacted Elefano after one of its drivers received a citation and apologized for operating without a permit in violation of the City's ordinance. To address the neighbors' concerns, Elefano asked Eklund to seek the neighbors' approval, but in his affidavit he also claimed he "misspoke by suggesting that the City would not entertain a

8

permit for the use of the street without neighbor approval." Elefano then stated in the affidavit that instead of applying for a permit, Thomas filed this lawsuit, and during the legal proceedings was permitted to use Sassine for heavy traffic through February 11, 2021, when he was then required to apply for and obtain a permit. Even after February 11, Elefano received complaints from the residents who live in houses adjacent to Sassine that Thomas continued to operate heavy trucks on Sassine in violation of City ordinances.

Once the dispute with Thomas arose and given the City's inability to collect the bond to repair the roads, the City updated the form it used to issue permits allowing heavy trucks to use City streets. In his affidavit, Elefano explained the updated forms "are intended to gather necessary information about the use of the roads and duration of the project, the specific trucks that will be engaged in hauling, and the condition of the road prior to the start of the project." The application does not address whether the residents living next to Sassine must approve this type of permit.

In November 2020, the trial court issued a temporary injunction to allow the permit process to play out. In March 2021, Thomas's attorney submitted the updated application, striking through portions and changing some of the language, while listing several objections, which assert that some of the applications' terms are unreasonable. Elefano responded that the application was "administratively

9

incomplete," and he advised it omitted necessary information, which he asked Thomas to provide. On the other hand, Thomas claims he completed the application, and the City's refusal process the permit amounts to the denial of his application.

In response to Thomas's claim that the City has not equally applied its heavy truck ordinances, Elefano averred that the City had not permitted any other company to use Sassine to haul heavy loads on an unlimited, ongoing basis. Elefano acknowledged the City had given Enterprise a pipeline permit, but that permit did not grant road use to trucks that "do not otherwise comply with the City's ordinances" and had not granted Enterprise a permit to operate trucks exceeding 48,000 pounds on Sassine. Elefano also distinguished Thomas's use of Sassine from a resident who lived on the street (Mr. Artola) who operated a dump truck company, averring that the resident "drives the trucks empty on Sassine for the sole purpose of leaving and returning to his residence[,]" unlike Thomas's use, "which involves repeated hauling of heavy loads up and down Sassine." Elefano averred that the street "was not designed to sustain prolonged hauling activities and on which the City has observed significant damages" since Thomas began his hauling operations, which included running as many as thirty loaded trucks a day. Elefano testified the City received specific citizen complaints that Thomas's business operation was damaging Sassine and to his knowledge had not received similar complaints about other operators. Elefano also averred that Thomas's property had entry access from

10

West Port Arthur Road prior to having driveway access to Sassine, and photographs showed heavy trucks parked on the property at that time. Finally, Elefano averred the City has not restricted Thomas's use of, or access to, his property, which remains accessible to "all routine traffic from West Port Arthur Road and Sassine Avenue."

Thomas testified that Mr. Artola's dump trucks weighed approximately 25,000 pounds when empty. Although Thomas testified he believed Artola's trucks were rated for 70,000 pounds, he could not identify anyone who runs 80,000-pound vehicles up and down Sassine between fifteen and thirty times per day. Elsewhere in his testimony Thomas identified vehicles that weighed 80,000 pounds making thirty trips on Sassine in a given day, including Primoris, Larrett, and Florida Gas.[2] However, he testified that when Florida Gas was constructing a new pipeline on his property, they had 120,000-pound loads that went in and out continuously for months.

Thomas testified that the State's permit limit for the mud trucks was 80,000 pounds. Some testimony provided during the hearings on the Plea to the Jurisdiction indicated that the trucks loaded with drilling mud weighed 80,000 pounds, while other testimony indicated the trucks weighed 50,000 pounds. Thomas testified it was

---

[2]This testimony is unclear as to whether he was describing companies hauling mud for landfarming or whether he was referring to separate pipeline construction activities.

possible to reduce the truck loads to 48,000 pounds to comply with the ordinance, but it was financially irresponsible and would double or triple the heavy truck traffic on Sassine.

## II. Pleadings and Procedural Posture

In October 2020, Thomas initially sued the City seeking injunctive relief, which the trial court initially granted but ultimately allowed to expire. His Fourth Amended Petition was the live pleading when the Plea to the Jurisdiction hearing occurred. In that Petition, Thomas pleaded causes of action for tortious interference, violations of the Equal Protection Clause and alternatively, inverse condemnation and regulatory taking, declaratory relief against both defendants, *ultra vires* actions against Elefano, and Thomas sought to enjoin City's enforcement of the ordinances.[3]

Thomas complains that Appellants "are enforcing the City's ordinances 106-7 and 106-8 against Plaintiff in a manner that is pre-empted by state law and/or violates Plaintiff's right to Equal Protection under the Texas Constitution." He "does not seek to completely invalidate the Ordinances in question," rather he "is seeking injunctive relief against [Appellants'] enforcement of the Ordinances" in a "commercially unreasonable" manner which "effectively prohibits an oil and gas activity on Plaintiff's land in violation of the preemptive effect of state statutory law

---

[3]Thomas subsequently nonsuited his tortious interference claim.

12

and violates Plaintiff's right to Equal Protection under the Texas Constitution." Thomas also alleges that Appellants granted permits to other similarly situated parties for loads over 10,000 pounds and some over 48,000 pounds without imposing the same requirements. Thomas asserts the most unreasonable condition of the permit application is that "residents on or near Sassine have to agree to the operation of heavy trucks by Plaintiff's customers." According to Thomas, the City's "enforcement of the Ordinances is commercially unreasonable and effectively prohibits oil and gas operations."

In their Amended Plea to the Jurisdiction, Appellants contend that immunity barred Thomas's claims, the pleadings and jurisdictional evidence did not establish valid waivers of immunity, the takings claims were not ripe, and they challenged the trial court's ability to provide equitable relief by enjoining the City's enforcement of penal ordinances. Appellants attached evidence to their Plea, including Elefano's affidavit, hearing testimony, the ordinances, Thomas's permit application and objections, and photographs of Thomas's property. The trial court also conducted a hearing where it heard live testimony and admitted the parties' various exhibits.

### III. Standard of Review

Sovereign immunity from suit defeats the trial court's subject matter jurisdiction and is properly raised in a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). A court may not decide

13

a case unless it has subject matter jurisdiction over the dispute. *Id.* at 226. A plea to the jurisdiction challenges the trial court's power to exercise subject matter jurisdiction over a claim. *Id.*; *see also City of Waco v. Kirwan*, 298 S.W.3d 618, 621 (Tex. 2009).

We review a trial court's ruling on a plea to the jurisdiction using a *de novo* standard. *See State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007); *Miranda*, 133 S.W.3d at 226. A plea to the jurisdiction is a dilatory plea typically used to defeat a plaintiff's cause of action without regard to whether the claims have merit. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). In our review, we look first to the plaintiff's petition and liberally construe the pleadings to determine the pleader's intent. *See Holland*, 221 S.W.3d at 642–43. We may also consider evidence in the record when it is pertinent to any relevant jurisdictional facts. *See id.* at 643; *Bland*, 34 S.W.3d at 555. "A plea should not be granted if a fact issue is presented as to the court's jurisdiction, but if the relevant undisputed evidence negates jurisdiction, then the plea to the jurisdiction must be granted." *Holland*, 221 S.W.3d at 643 (citing *Miranda*, 133 S.W.3d at 227–28). When "evidence is presented with a plea to the jurisdiction, the court reviews the relevant evidence and may rule on the plea as a matter of law if the evidence does not raise a fact issue on the jurisdictional question, a standard that generally mirrors the summary-judgment standard." *Harris Cty. Flood Control Dist. v. Kerr*,

14

499 S.W.3d 793, 798 (Tex. 2016) (citing *Miranda*, 133 S.W.3d at 227–28). While we are mindful of this standard, we recognize we should not delve "so far into the substance of the claims presented that plaintiffs are required to put on their case simply to establish jurisdiction." *See Bland*, 34 S.W.3d at 554.

### IV. Analysis

### A. Governmental Immunity Generally

Governmental immunity protects the state's political subdivisions, including cities and their officers, from liability. *Hous. Belt & Terminal Railway Co. v. City of Houston*, 487 S.W.3d 154, 157 (Tex. 2016). The reason for this is that "it shields 'the public from the costs and consequences of improvident actions of their governments.'" *Id.* (quoting *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006)). However, in limiting immunity courts have reasoned that "extending immunity to officials using state resources in violation of the law would not be an efficient way of ensuring those resources are spent as intended." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). Accordingly, governmental immunity will not bar claims that a government officer acted *ultra vires*, or without legal authority, in carrying out his duties. *Hous. Belt*, 487 S.W.3d at 157–58. Absent a statutory waiver of immunity by the Legislature, a plaintiff can proceed against the government only if an official's actions were *ultra vires*. *See Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017) (noting same in context of a regent's complaint against

15

a university's chancellor who withheld certain information pursuant to his interpretation of federal privacy laws).

## B. Preemption and Texas Natural Resources Code Section 81.0523

Also at issue in this case is Texas Natural Resources Code section 81.0523, entitled "Exclusive Jurisdiction and Express Preemption." Tex. Nat. Res. Code Ann. § 81.0523. That section provides as follows:

(a) In this section:

> (1) "Commercially reasonable" means a condition that would allow a reasonably prudent operator to fully, effectively, and economically exploit, develop, produce, process, and transport oil and gas, as determined based on the objective standard of a reasonably prudent operator and not on an individualized assessment of an actual operator's capacity to act.

> (2) "Oil and gas operation" means an activity associated with the exploration, development, production, processing, and transportation of oil and gas, including drilling, hydraulic fracture stimulation, completion, maintenance, reworking, recompletion, disposal, plugging and abandonment, secondary and tertiary recovery, and remediation activities.

(b) An oil and gas operation is subject to the exclusive jurisdiction of this state. Except as provided by Subsection (c), a municipality or other political subdivision may not enact or enforce an ordinance or other measure, or an amendment or revision of an ordinance or other measure, that bans, limits, or otherwise regulates an oil and gas operation within the boundaries or extraterritorial jurisdiction of the municipality or political subdivision.

(c) The authority of a municipality or other political subdivision to regulate an oil and gas operation is expressly preempted, except that a

16

municipality may enact, amend, or enforce an ordinance or other measure that:

> (1) regulates only aboveground activity related to an oil and gas operation that occurs at or above the surface of the ground, including a regulation governing fire and emergency response, traffic, lights, or noise, or imposing notice or reasonable setback requirements;
>
> (2) is commercially reasonable;
>
> (3) does not effectively prohibit an oil and gas operation conducted by a reasonably prudent operator; and
>
> (4) is not otherwise preempted by state or federal law.
>
> (d) An ordinance or other measure is considered prima facie to be commercially reasonable if the ordinance or other measure has been in effect for at least five years and has allowed the oil and gas operations at issue to continue during that period.

*Id*. While section 81.0523 expressly preempts municipal regulation of oil and gas operations, it has carved out an exception that includes a municipality's ability to enact or enforce an ordinance regulating traffic or noise. *See id*. § 81.0523(c)(1). However, the municipal enforcement of a traffic ordinance must be "commercially reasonable" as defined in the statute and cannot prohibit an oil and gas operation conducted by a reasonably prudent operator. *See id*. § 81.0523(c)(2), (3). Incorporated into the definition of "commercially reasonable" is the notion that a "reasonably prudent operator" should be allowed to "fully[]" and "economically" engage in his operation. *See id*. § 81.0523(a)(1). The questions we must ask are: (1)

17

whether the City's ordinance and its enforcement are "commercially reasonable" and (2) whether Thomas acted as a "reasonably prudent operator" of his landfarm. With these questions in mind, we turn to our analysis.

## C. Issue One: The City's Challenges to Thomas's Claims

In their first issue Appellants argue governmental immunity applies and ask whether the trial court erred in denying their Plea to the Jurisdiction where Thomas failed to prove that either the City consented to suit, a City official acted *ultra vires*, or that the ordinances were facially unconstitutional. Appellants' issue incorporates various sub-arguments that we address below.

### 1. Ultra Vires and Preemption

On appeal, Appellants contend that Thomas failed to allege, and evidence negates, any *ultra vires* conduct by Elefano.[4] They also argue that Texas Natural Resources Code section 81.0523 does not preempt its ordinances, and Elefano's conduct comported with State laws and the Constitution.

As noted above, while governmental immunity provides broad protection to the state and its officers, it will not bar a suit against a governmental officer for acting

---

[4]With respect to the City, governmental entities are not proper parties to *ultra vires* claims. *See Hall v. McRaven*, 508 S.W.3d 232, 239 (Tex. 2017); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 (Tex. 2009). Rather, a plaintiff must sue the relevant officers in their official capacities; however, here, Elefano clearly is a proper party, and Thomas sued him in his official capacity. *See Heinrich*, 284 S.W.3d at 372–73.

outside his authority–i.e., an *ultra vires* suit. *Hous. Belt*, 487 S.W.3d at 161 (citing *Tex. Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 393 (Tex. 2011)). To qualify under the *ultra vires* exception, a suit cannot complain of a government officer's exercise of discretion, "'but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act.'" *Id.* (quoting *Heinrich*, 284 S.W.3d at 372); *see also Schroeder v. Escalera Ranch Owners' Assoc., Inc.*, No. 20-0855, 2022 WL 1815042, at *2 (Tex. June 3, 2022).

> The Texas Supreme Court has explained:

> the principle arising out of *Heinrich* and its progeny is that governmental immunity bars suits complaining of an exercise of *absolute* discretion but not suits complaining of *either* an officer's failure to perform a ministerial act *or* an officer's exercise of judgment or *limited* discretion without reference to or in conflict with the constraints of the law authorizing the official to act. Only when such absolute discretion—free decision-making without any constraints—is granted are *ultra vires* suits absolutely barred.

*Hous. Belt*, 487 S.W.3d at 163 (emphasis original). While only exercises of absolute discretion are completely protected, whether a suit attacking an exercise of limited discretion is barred depends upon the grant of authority at issue in each case. *Id.* at 164. "If the challenged actions 'were not truly outside the officer's authority or in conflict with the law,' then the plaintiff has not stated a valid ultra vires claim and governmental immunity will bar the suit." *Schroeder*, 2022 WL 1815042, at *2

19

(quoting *Matzen v. McLane*, No. 20-0523, 2021 WL 5977218, at \*4 (Tex. Dec. 17, 2021)). Said another way, an *ultra vires* claim based on actions taken without legal authority has two elements: "(1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority." *McRaven*, 508 S.W.3d at 239 (citation omitted).

In his Fourth Amended Petition, Thomas alleges that Elefano did not have "absolute discretion" to refuse to allow him and his customers to operate heavy trucks on Sassine and impose unreasonable conditions to obtain a permit or agreement while allowing others to operate heavy trucks on other City streets without a permit or granting permits or agreements to others without imposing the same or commercially similar conditions as those Elefano imposed on him as the plaintiff in the suit. Thomas alleges that as the Director of Public Works, Elefano is required to either allow him and his customers to operate their trucks on Sassine without a permit/agreement or to permit them on the same or commercially similar terms as other similarly situated parties or without reference to "the constraints placed on his discretion by the local law authorizing him to act." Thomas further alleges that Elefano's conduct violated constraints placed on him by State law.

The City ordinances authorize Elefano to determine and designate streets where commercial vehicles exceeding 10,000 pounds may be prohibited from operating. *See* Port Arthur, Tex., Code of Ordinances ch. 16, art. I, § 106-7(a).

20

Elefano testified, and other evidence showed, the City had developed truck routes where commercial vehicles exceeding 10,000 pounds could operate, and Sassine was not included on the truck route. The other City ordinance governed certain roadways that were not included in these truck routes, and thus, applies to Sassine. *See id.* § 106-8(a).

For roadways not included in the truck routes, any vehicles exceeding the legal load limit of 10,000 pounds required the filing of an application with the Director of Public Works, but the vehicles could not exceed a gross weight of 48,000 pounds. *See id.* The application must specify the area and time necessary to complete the work. *See id.* Upon receipt of the application, Elefano was required to determine and designate particular roadways capable of sustaining the excess load and duration and then "cause to be executed an agreement between the contractor and city." *See id.* The statute also required the applicant to provide a bond in an amount set by the Department of Public Works based on the estimated cost to the City which would reasonably be necessary to reconstruct the covered roadway. *See id.*

Thomas complains that Elefano's enforcement of this statute by requiring him and his customers to obtain a permit or agreement when they had not made others do so constituted an *ultra vires* act. Specifically, Thomas pleaded that Elefano acted without reference to or in conflict with the constraints placed on his discretion by the local law authorizing him to act. Thus, Thomas has pleaded an *ultra vires* claim

21

sufficient to invoke the trial court's jurisdiction; however, to determine whether Elefano acted *ultra vires,* we look at the ordinances granting him authority and the jurisdictional evidence the trial court considered in the hearing. *See Hous. Belt*, 487 S.W.3d at 164 (noting we look to the ordinance's language to determine whether the plaintiff has properly alleged an *ultra vires* claim). The City ordinances vest Elefano, as the Director of Public Works, with the authority to determine heavy truck routes. The City has those routes in place, and they do not include Sassine. That same ordinance prohibits the operation of commercial vehicles exceeding 10,000 pounds on streets like Sassine. *See* Port Arthur, Tex., Code of Ordinances ch. 16, art. I, § 106-7(a). However, Thomas or his customers could apply to use Sassine to operate trucks weighing more than 10,000 pounds as long as they did not have a gross weight of more than 48,000 pounds. *See id.* § 106-8. However, rather than apply for a permit that complied with the City's ordinance, Thomas marked through the application and inserted weight limits in excess of those that are in the City's ordinance. The ordinance further empowered Elefano to determine an appropriate bond and to identify roadways that could potentially handle weights in excess of those in its ordinance; however, the application required the applicant to provide the information necessary to making that determination, information like the duration of the project and weight of the loads. *See id.*

The evidence included with Appellants' Amended Plea to the Jurisdiction established that instead of specifying duration of use, Thomas simply answered "ongoing" and raised the weight limit on the application from 48,000 to 80,000 pounds. Thomas's chief complaint was that he had to complete an application while other heavy truck users in the area had not. This does not establish that Elefano acted *ultra vires*. Indeed, the ordinances at issue empowered Elefano to take applications and to determine, based on the information provided, what roads could handle the load and the duration and establish the amount that would be required for the bond so the parties could then execute a corresponding agreement. *See id.* §§ 106-7, 106-8. The evidence that Thomas was the first person the City required to complete the application after the City updated its forms does not mean that Elefano acted outside his authority. The evidence, which Thomas did not dispute, established that Elefano updated the City's application to obtain information that he needed to determine the amount for an appropriate bond, which the ordinance empowered him to do, and information that would, if later necessary, aid the City in its effort to collect on the bond.

In its next sub-issue, the City contends that Thomas cannot establish an *ultra vires* claim that Elefano's enforcement of ordinances 106-7 and 106-8 are preempted by state law, and in essence, he acted in conflict with the law. In his Fourth Amended Petition Thomas complains that Texas Natural Resources Code section 81.0523

23

expressly preempts the City's authority to regulate oil and gas operations and only allows the City to issue and enforce limited "commercially reasonable" regulations concerning "aboveground activity[.]" Further, Thomas asserts Elefano's conduct amounts to "an effort to enforce an ordinance in a manner that is pre-empted by state law."

Section 81.0523 expressly preempts any attempts to regulate oil and gas operations and gives the state exclusive jurisdiction. *See* Tex. Nat. Res. Code Ann. § 81.0523(b), (c). "Oil and gas operation" includes disposal and remediation activities, among other things. *Id.* § 81.0523(a)(2). The statute delineates various exceptions to the State's preemption, including allowing municipalities to enact or enforce traffic or noise regulations if those regulations are "commercially reasonable" and do "not effectively prohibit an oil and gas operation conducted by a reasonably prudent operator." *Id.* § 81.0523(c). The statute defines "commercially reasonable" as allowing a "reasonably prudent operator" to "fully, effectively, and economically exploit" his operation and explains the determination is based "on the objective standard of a reasonably prudent operator" rather than "an individualized assessment of an operator's capacity to act." *Id.* § 81.0523(a)(1).

An ordinance is "considered prima facie to be commercially reasonable" if it has been in effect for at least five years and has allowed the oil and gas operations at issue to continue during that period. *Id.* § 81.0523(d). In this case, Thomas

24

contends the City's enforcement is commercially unreasonable, while the City counters that Thomas is not acting as a reasonably prudent operator. The City's ordinances at issue have been in place since 1961, although evidence adduced at the Plea to the Jurisdiction hearing indicated that Thomas did not begin landfarming until 2018 or 2019. In early 2020, the City advised he would not be allowed to continue using Sassine until he acquired a permit; even, the City gave Thomas a temporary permit, which allowed him to complete the particular landfarming project he had underway after his customer posted a bond. Even assuming the ordinance at issue is "commercially reasonable," as we must, the jurisdictional evidence shows fact issues exist regarding whether the *enforcement* of the ordinance is "commercially reasonable" and whether Thomas acted as a reasonably prudent operator. *See id.* § 81.0523(c)(1)–(3).

Thomas testified that the RRC permitted the waste hauling trucks that carried the drilling mud for weights up to 80,000 pounds, and the RRC had permitted his property for landfarm use. Thomas testified that reducing the amount of mud to the 48,000-pound threshold the City requires would cause him to double or triple the number of loads, making it economically unfeasible and increasing traffic on the roadway. However, Larrett's representative, Eklund, testified that he thought their loaded mud trucks weighed 50,000 pounds, but if the City only allowed them to haul

5,000 pounds of mud at a time, it would be "a tremendous extra effort" that he could not agree to.

Eklund testified that if they could not haul mud to Thomas's permitted site, their drilling operations would ultimately be shut down. The customer also described the difficulties and dangers of the loaded mud trucks using another route. He testified that except Sassine, the other routes were "hindersome or cumbersome." Eklund testified that when he initially approached Elefano regarding obtaining a permit, Elefano advised the only way he would get a permit is if all the residents on Sassine signed off on it. Elefano does not dispute this but insists that he misspoke when he said this, and ultimately, the Thomas's application did not depend on its approval by the residents next to Sassine.

The City adduced evidence that a "No Trucks" sign had been up on Sassine for years before 2018 or 2019 when Thomas commenced his landfarming operation. Thomas provided conflicting testimony about the "No Trucks" sign. He testified the "No Trucks" sign had been in place since 2007, but a Sassine resident ran trucks there anyway and elsewhere testified the sign was not installed until 2019 or 2020. There was also evidence presented that while inconvenient, accessing Thomas's property from another route was possible. Thomas explained that before he built a driveway that gave him the ability to allow heavy equipment access to his property via Sassine, wooden mats were used to access the property from Sassine or that

26

heavy equipment accessed his property using another route, Highway 365. Further, Thomas testified that while it was physically possible to reduce the weights of the loaded trucks below 48,000 pounds, it was unreasonable and inefficient to do so and would increase the number of loaded trucks required to use Sassine.

The City agreed that before Thomas's landfarming project, the permitting process that applied to loaded trucks truck weighting more than 10,000 pounds was "relatively informal[,]" and that the permit Thomas obtained from the City was its first authorizing the use of a City street for use by heavy trucks. Elefano further explained that Thomas's landfarming situation was unique based on the combination of heavy loads required by his operation and the number of complaints received from citizens about those operations. Elefano averred in his affidavit that he began receiving complaints from residents about the heavy trucks traveling on Sassine to Thomas's property and first became aware of the drilling mud disposal operations that involved the use of Sassine in 2020. Elefano also explained in his affidavit that the City's inability to collect on Thomas's prior bond caused it to update the form and process it uses to permit this type of operation. The City's new process and its forms ask the applicant to provide information similar to that required by the State when seeking a permit to use a State highway, and Elefano said the information required in its updated form should help the City enforce the ordinances and protect

27

its ability to collect on bonds so that it may repair damages caused by heavy trucks to City streets.

Evidence established that Thomas's family owned the land since 1913, but he did not acquire the lots adjacent to Sassine until 2007, which for the first time allowed access to the property from Sassine. The driveway to connect Thomas's property to Sassine was not built until 2018; however, no one obtained a permit to do so. Before 2018, the pipeline companies and Thomas's heavy trucks had to access Thomas's property in other ways. However, Thomas denied ever having an alternate access to his property for his landfarming operations before he and Florida Gas built the driveway connecting the lots he owned to Sassine, except for the "very few" trucks Thomas acknowledged that he said had made it across the railroad tracks and white bridge from West Port Arthur Road.

Viewing the evidence in the light most favorable to Thomas, fact issues exist regarding whether Thomas was a reasonably prudent operator and whether Elefano enforced the ordinances in a "commercially reasonable" manner. These fact issues implicate the State's preemption under Texas Natural Resources Code section 81.0523. How those questions are ultimately answered in a trial will determine the lawfulness of Elefano's conduct in enforcing the City's ordinances, a matter on which this Court expresses no opinion. But because the evidence in the hearing on the plea demonstrates fact issues exist on the jurisdictional issues, the trial court

28

properly denied the Amended Plea to the Jurisdiction as to Thomas's *ultra vires* claim against Elefano. *See Holland*, 221 S.W.3d at 643 (a plea should not be granted if a fact issue exists as to the court's jurisdiction).

## 2. Declaratory Judgment Action

Appellants next contend that the Uniform Declaratory Judgments Act ("UDJA") does not waive immunity when a plaintiff is seeking a declaration of rights under a statute or challenging a governmental entity's actions under a statute or ordinance. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 37.001–011. No City ordinance "shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State." Tex. Const. art. XI, § 5. Thomas argues the City's enforcement of its ordinances contradicts Texas Natural Resources Code section 81.0523, which permits a City to enforce traffic ordinances if it does so in a "commercially reasonable manner" that does not impede the oil and gas activities of a "reasonably prudent operator."

"[T]he UDJA does not waive the state's sovereign immunity when the plaintiff seeks a declaration of his or her rights under a statute or other law." *Tex. Dept. of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011). Specifically, the Texas Supreme Court has explained where a plaintiff alleges a state official's acts or omissions trampled on his rights, the proper defendant in an *ultra vires* lawsuit is the state official not the agency. *See id.* (citing *Heinrich*, 284 S.W.3d at 372–73). While

29

the UDJA waives sovereign immunity in some cases, Thomas's claim against the City does not fall within the scope of those express waivers. *See id.*; *Heinrich*, 284 S.W.3d at 373 n.6; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 37.006(b) (requiring municipality to be made a party if ordinance is alleged to be unconstitutional). We agree that the City may be a proper party to a declaratory judgment action that challenges the validity of an ordinance but not its actions under it. *See Sefzik*, 355 S.W.3d at 622 (reasoning that plaintiff did not challenge the validity of the statute, rather he challenged the agency's actions under it). However, Thomas expressly states in his Fourth Amended Petition that he does not seek to invalidate the ordinances, rather he complains about the enforcement of them. Since Thomas challenged the enforcement of the ordinances rather than their validity, we conclude the City retains its immunity against Thomas's UDJA claim. *See id.* However, because fact issues exist regarding Elefano's alleged *ultra vires* actions in enforcing the statute under the Natural Resources Code, the trial court properly denied the jurisdictional plea as to the UDJA claim against him. *See id.* at 621 (explaining UDJA claim could be brought against state official under the ultra vires exception, but the state agency remains immune).

### 3. Violations of the Equal Protection Clause

Next, the City argues that it maintains immunity against Thomas's claim for violations of the Equal Protection Clause. Thomas pleaded that because Appellants

30

violated the Equal Protection Clause, he "had been damaged in an amount greatly exceeding the minimal jurisdictional limit of this Court." He also sought injunctive relief to prevent the City from enforcing the ordinance in an unconstitutional manner.

Claims of discriminatory or selective enforcement are based on the constitutional guarantee of equal protection under the law. *See* Tex. Const. art. I, § 3. Suits for equitable or injunctive relief are permitted for constitutional violations against the City. *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148–49 (Tex. 1995). This limited waiver of immunity exists only when the plaintiff has pleaded a viable constitutional claim. *City of Houston v. Johnson*, 353 S.W.3d 499, 504 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). Immunity is not waived "if the constitutional claims are facially invalid." *Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015).

"Like the federal constitution, the equal-protection clause of the state constitution directs governmental actors to treat all similarly situated persons alike." *City of Houston v. Johnson*, 353 S.W.3d 499, 503 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). To assert an equal protection claim, Thomas must establish that he was treated differently than other similarly situated parties without a reasonable basis. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 939 (Tex. 1998); *City of Floresville v. Starnes Invest. Grp., LLC*, 502 S.W.3d 859, 868 (Tex. App.—San

31

Antonio 2016, no pet.). A plaintiff must allege that he is being treated differently from those whose situation is directly comparable in all material respects. *Starnes Invest. Grp., LLC*, 502 S.W.3d at 868; *Odutayo v. City of Houston*, No. 01-12-00132-CV, 2013 WL 1718334, at *3 (Tex. App.—Houston [1st Dist.] Apr. 18, 2013, no pet.) (mem. op.). It is insufficient to show the law has been enforced against some and not others. *State v. Malone Service Co.*, 829 S.W.2d 763, 766 (Tex. 1992). Rather, one must show "the government has purposefully discriminated on the basis of such impermissible considerations as race, religion, or the desire to prevent the exercise of constitutional rights." *Id.* (citations omitted). Here, neither a suspect classification nor a fundamental right is involved, so Thomas "must further demonstrate that the challenged decision is not rationally related to a legitimate governmental purpose." *Klumb*, 458 S.W.3d at 13 (citing *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 639 (Tex. 2008)). In a rational-basis review, we examine "whether the challenged action has a rational basis and whether use of the challenged classification would reasonably promote that purpose." *Id.*

As the City and Elefano point out, it received specific citizen complaints regarding Thomas's operation and the damages that operation was causing to the roadway. The City provided evidence of this in Elefano's affidavit and testimony of residents living on Sassine describing the deterioration of the roadway. The City explained it relied on citizen complaints to alert it of code violations that needed to

32

be addressed. Courts have recognized a rational basis for government entities focusing and allocating their limited resources based on complaints by impacted citizens. *See, e.g., Three Legged Monkey, L.P. v. City of El Paso*, 652 Fed. Appx. 236, 239 (5th Cir. 2016) (stating city had rational basis when it increased enforcement responding to complaints). Likewise, Thomas complained that other heavy trucks were being allowed to use Sassine and neighboring streets. However, the City provided evidence that Thomas's ongoing operation of up to thirty loads per day coming in and out created more wear and tear on the City streets compared to the other trucks Thomas asserted were similar. As to Thomas's complaint that he was the first person the City required to apply for a permit, the City offered evidence it intended to use the forms going forward. Elefano's affidavit also explains that the updated application is designed to help enforce the City's ordinances and to collect on bonds to secure the funds the City needs to repair its streets. The City's evidence also shows that under the informal application process the City used on Thomas's prior project, the City was unable to collect on Thomas's bond.

Even though Texas law does not shield State officials from equitable relief for violating a citizen's constitutional rights, a suit for damages for violating a citizen's constitutional violations is not allowed, except for takings claims. *See Bouillion*, 896 S.W.2d at 149 (distinguishing between suits seeking to declare statutes unconstitutional and ones seeking damages as remedy for allegedly unconstitutional

33

act and concluding no private right of action for damages exists); *Odutayo*, 2013 WL 1718334, at \*3. As to Thomas's claim for money damages for the alleged violation of the Equal Protections Clause, the claim is not allowed. *See Bouillion*, 896 S.W.2d at 149. Thomas has failed to meet his burden to demonstrate the City and Elefano's actions were not rationally related to legitimate government objectives.

### 4. Inverse Condemnation and Regulatory Taking

Appellants argue that the trial Court lacks jurisdiction over Thomas's inverse condemnation and regulatory takings claim because (1) it is not ripe, and (2) Thomas has failed to state a viable claim sufficient to overcome governmental immunity. In his Fourth Amended Petition Thomas pleaded a cause of action for inverse condemnation or regulatory taking. He alleged that he "has a vested property right in the use and enjoyment of his land generally and specifically in receiving payment from energy and pipelines companies for the legal disposal of oil and gas waste (mud) on his land."

The Texas Constitution provides that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation. . . ." Tex. Const. art. I, § 17(a). The Texas Constitution waives government immunity with respect to inverse-condemnation claims. *City of Houston v. Carlson*, 451 S.W.3d 828, 830 (Tex. 2014); *City of Dallas v. VSC, LLC,* 347 S.W.3d 231, 236 (Tex. 2011). "Nevertheless, such a claim is predicated upon a viable allegation of

34

taking." *Carlson*, 451 S.W.3d at 830 (citing *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012)). Without a properly pled takings claim, the state retains immunity. *Id.* (citation omitted); *see also City of Baytown v. Schrock*, 645 S.W.3d 174, 176 (Tex. 2022) ("When government action falls short of a constitutional taking, immunity bars many such claims."). In such circumstances, we must sustain a properly raised plea to the jurisdiction. *See Hearts Bluff Game Ranch*, 381 S.W.3d at 491–92 (dismissing case for lack of jurisdiction after concluding plaintiff had not alleged a taking).

"An inverse condemnation may occur if, instead of initiating proceedings to condemn property through its powers of eminent domain, the government intentionally physically appropriates or otherwise unreasonably interferes with the owner's right to use and enjoy his or her property." *State v. Brownlow*, 319 S.W.3d 649, 652 (Tex. 2010) (citations omitted). An inverse condemnation proceeding is essentially that the government has intentionally taken or unreasonably interfered with an owner's use of property and the property owner is attempting to recover compensation for the lost or impaired rights. *Id.* Immunity from suit does not protect the government from a claim under the takings clause. *Id.*; *Holland*, 221 S.W.3d at 643. To assert an inverse-condemnation claim against the State, a party must plead these elements: (1) the State intentionally performed an act in the exercise of its lawful authority; (2) that resulted in the taking, damaging, or destruction of the

35

party's property; (3) for public use. *City of Austin v. Liberty Mut. Ins.*, 431 S.W.3d 817, 824 (Tex. App.—Austin 2014, no pet.).

In *City of Baytown v. Schrock*, the Texas Supreme Court recently examined the issue of whether a claim of economic harm to property resulting from the improper enforcement of a municipal ordinance alleges a regulatory taking. *See* 645 S.W.3d at 178. Like the ordinance in that case and the one in *City of Dallas v. Carlson*, the ordinances here do not regulate land use. *See Schrock*, 645 S.W.3d at 179–80; *Carlson*, 451 S.W.3d at 830, 832. The ordinance in *Schrock* dealt with utilities service, and the Court explained regulation of that service was not a regulation of the property itself. *See Schrock*, 645 S.W.3d at 179–80. There, the City of Baytown refused to connect utility service to a rental property Schrock owned until outstanding utility bills were paid, and Schrock alleged the City's refusal to reconnect utility service damaged the property. *See id.* at 177. Here, the ordinances dealt with regulating road use and specifically, heavy traffic on the roads, which was not a regulation of Thomas's property. *See id.* at 179–80. Like the claims in *Carlson* and *Schrock*, the true nature of Thomas's claim "lies with the City's [alleged] wrongful enforcement of its ordinance, not in an intentional taking or damage of his property for public use." *See id.* at 180.

The *Schrock* Court explained:

> While we do not foreclose the possibility that enforcement of an ordinance that does not directly regulate land use could amount to a taking, this one does not. A regulation with "a condition of use 'so onerous that its effect is tantamount to a direct appropriation or ouster'" may impair a property "so restrictively, or intrude on property rights so extensively, that it effectively 'takes' the property." However, "nearly every civil-enforcement action results in a property loss of some kind." Property damage due to civil enforcement of an ordinance unrelated to land use, standing on its own, is not enough to sustain a regulatory takings claim.

*Id.* (quoting *Carlson*, 451 S.W.3d at 831–33; *Jim Olive Photography v. Univ. of Hous. Sys.*, 624 S.W.3d 764, 771–72 (Tex. 2021)).

Viewing the allegations contained in Thomas's pleadings and the evidence in support of the Amended Plea to the Jurisdiction in the light most favorable to Thomas, we conclude Thomas has failed to allege a viable inverse condemnation or regulatory takings claim to establish a waiver of immunity. *See id.* Given our resolution of this issue, we need not address the parties' dispute regarding ripeness, as doing so would afford the City no greater relief. *See* Tex. R. App. P. 47.1.

## D. Issue Two: Civil Court's Ability to Enjoin Penal Ordinances

In its second issue, Appellants argue that the trial court lacks jurisdiction to grant Thomas's requested injunctive relief, because it would enjoin the City's ability to enforce a criminal ordinance. Thomas counters that he did not seek to invalidate

the ordinances, rather he sought to enjoin the enforcement of the ordinances in a way that violated the constitution and certain statutory provisions.

Generally, a court of equity will not enjoin the right of another branch of government to enforce a criminal law. *State v. Logue*, 376 S.W.2d 567, 569 (Tex. 1964); *City of Beaumont v. Starvin' Marvin's Bar and Grill, L.L.C.*, No. 09–11–00229–CV, 2011 WL 6748506, at *3 (Tex. App.—Beaumont Dec. 11, 2011, pet. denied) (mem. op.). However, courts have jurisdiction to determine whether ordinances imposing a fine have been preempted by State law. *See, e.g., City of Laredo v. Laredo Merchants Assoc.*, 550 S.W.3d 586, 589 (Tex. 2018) (addressing preemption of a local regulation limiting plastic bag usage that imposed a fine). When doing so, courts look at the "essence" of the case and whether the issues are substantively more civil or criminal. *See Tex. Propane Gas Assoc. v. City of Houston*, 622 S.W.3d 791, 799 (Tex. 2021). Here, Thomas primarily complains that section 81.0523, a civil statute, forbids the City's enforcement of its traffic regulations in a commercially unreasonable way that impacts his landfarming activity. *See id.* at 798–99 (explaining "essence" inquiry and the scope of the civil statute). Adjudicating the merits of Thomas's claims will turn on the scope of section 81.0523 and the definitions contained therein. *See id.* Specifically, whether State law preempts the traffic ordinances in this case necessarily depends upon whether Appellants' actions in enforcing it were "commercially reasonable" and whether

38

Thomas acted as a "reasonably prudent operator." *See* Tex. Nat. Res. Code Ann. § 81.0523(b), (c). Accordingly, we conclude that the "essence" of the case and the issues here are substantively more civil than criminal.

## Conclusion

Because Thomas has properly pleaded and the evidence raised a fact question regarding his *ultra vires* claims against Elefano and as to whether the enforcement of the traffic ordinances was preempted by the State statute in question, we affirm the trial court's denial of the Amended Plea to the Jurisdiction on those claims, and its denial of the Amended Plea to the jurisdiction on the declaratory judgment action against Elefano. However, because we hold that Thomas's claim under the UDJA for a declaratory judgment against the City, and his claims against the City for alleged Equal Protection Clause violations, inverse condemnation, and regulatory takings are barred by governmental immunity, we reverse the trial court's denial of the Amended Plea to the Jurisdiction as to those claims and render a judgment of dismissal.

AFFIRMED IN PART, REVERSED AND RENDERED IN PART.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on June 16, 2022
Opinion Delivered August 31, 2022
Before Golemon, C.J., Horton, and Johnson, JJ.

39